**BEL–GO ASSOCIATES–MULA ROAD, Appellant,**

v.

**Elizabeth VITALE, Victor A. Mercatante, Dominica Mamie Mercatante, and Leonard Scarcella, Appellees.**

No. 01–85–0407–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Nov. 20, 1986.

Rehearing Denied Dec. 31, 1986.

Charles E. Fitch, Preston C. Goodwin, De Lange, Hudspeth, Pitman & Katz, Houston, for appellant.

Harvey G. Brown, Jr., Barry Abrams, Sewell & Riggs, William A. Olson, John F. Olson, Olson & Olson, Houston, for appellees.

Before LEVY, DUNN and KEITH (Retired), JJ.

## OPINION

DUNN, Justice.

This is an appeal from summary judgment awarded to the appellees.

The appellant, a joint venture composed of Belcourt Construction Co. of Houston, Inc. and Sam B. Gottlieb (hereinafter referred to as "Bel-Go" or "appellants"), entered into an earnest money contract with Victor A. Mercatante, Dominica Mamie Mercatante, and Elizabeth Vitale, the mother of Dominica Mercatante and mother-in-law of Victor Mercatante (hereinafter referred to as "sellers" or "appellees"), to purchase a 10.58 acre tract of land, which fronted on State Farm to Market Road 1092, within the city limits of Stafford, Texas.

The parties first met on December 7, 1978, to review a proposed earnest money contract that had been drawn by Bel-Go's attorney. The sellers hired as their attorney Leonard Scarcella, (hereinafter referred to as "Scarcella"), one of the appellees herein and also mayor of Stafford, to review the proposed contract. Scarcella, in reviewing the proposed earnest money contract, specifically objected to two paragraphs, paragraphs 9(d) and 9(e), which are reproduced below:

9(d). Seller represents and warrants as of the date of this Agreement, and shall represent and warrant as of the closing date, that Seller has no knowledge of any matters which would, upon closing of the transaction herein contemplated, prevent Purchaser from obtaining a building permit for construction of an industrial warehouse and light manufacturing building or buildings to be constructed upon the property from all authorities from whom such permits and licenses may be necessary in order for Purchaser to commence and complete the construction contemplated by Purchaser. Such permits shall include approval of any architectural committees or other such bodies having authority to withhold

approval of construction with respect to the property being conveyed hereunder.

9(e). Seller [will] provide to Purchaser within thirty (30) days from date of execution hereof evidence reasonably satisfactory to Purchaser that all utilities, including, without limitation, gas, electricity, sewer, and adequate storm sewer systems are all available to the premises.

Scarcella explained to the purchaser, Bel-Go, that virtually all property in the Stafford area had some type of problem with drainage and that "drainage matters had to be addressed in regards to any building permit." Bel-Go's attorney agreed to modify these provisions in the earnest money contract.

Further negotiations were halted due to the fact that Bel-Go had developed financial problems. On May 18, 1979, Bel-Go's attorney contacted sellers to inform them that proper financing arrangements had been made, and another proposed earnest money contract was delivered to appellees by Bel-Go. This contract modified paragraph 9(d) and eliminated paragraph 9(e). The modified paragraph 9(d) differs from the proposed paragraph in the addition of a single sentence which has been underlined in the paragraph which is reproduced below:

> (d) Seller represents and warrants as of the date of this Agreement, and shall represent and warrant as of the closing date, that Seller has no knowledge of any matters which would, upon closing of the transaction herein contemplated, prevent Purchaser from obtaining a building permit for construction of an industrial warehouse and light manufacturing building or buildings to be constructed upon the property from all authorities from whom such permits and licenses may be necessary in order for Purchaser to commence and complete the construction contemplated by Purchaser. Such permits shall include approval of any architectural committees or other such bodies having authority to withhold approval of construction with respect to the property being conveyed hereunder. *In this respect, Seller shall cooperate with Purchaser in the submission of plans designed to obtain permits from the appropriate governmental authorities.*

(Emphasis added.) An addendum to the contract added the following language to paragraph 9(d):

> It is specifically recognized that Seller has furnished to Purchaser a copy of the current Land Use Subdivision Ordinance of the City of Stafford (Ordinance Number 114) as well as the latest draft (Draft 3) of the proposed land subdivision ordinance of the City of Stafford, and Seller has referred Purchaser to the Southern Standard Building Code, the National Electrical Code and to environmental regulations, and standards of appropriate state and federal agencies, and Purchaser is aware all proposed improvements may, and most probably will, be required to comply with these above referenced sources in their updated form at the time of application for subdivision plat approval and building permits.

The modified earnest money contract was signed by the parties on July 11, 1979.

Bel-Go hired Clarence Watkins, an architect who worked for Concept Consultants, Inc. ("C.C.I."), to prepare plans for the proposed development. Watkins met with Lawrence Vaccaro, the City of Stafford Building Director, to review the proposed development plans. The two men discussed the need for adequate drainage on the tract. C.C.I. hired Louis Fontenot, a civil engineer, to assist in obtaining a building permit from the City. Knowing that the tract drained onto F.M. 1092, a state street, Fontenot was familiar with the drainage regulations imposed by the Texas Highway Department. One such regulation was that only 150 feet of the property would be allowed to drain into the state street drainage ditch. However, Fontenot was also under the impression that the department routinely waived such requirements, and he assumed such a waiver would be available to Bel-Go. The sale of the property closed on December 28, 1979.

In January 1980, the appellants learned that although the City of Stafford had approved their building plans, no building permit would be issued until adequate drainage was obtained. The drainage would not be considered adequate until Texas Highway Department regulations had been met. This problem was relayed to Bel-Go by C.C.I. on January 26, 1980, in a memorandum setting out the specifics. The pertinent part of this memo is reproduced below:

PROBLEM:

* Drainage of 10.5 acre site must go to FM 1092.

* Since FM 1092 is a state owned street, it has to be approved by the State Highway Department.

* Highway Department will only allow 150' of the property to be drained.

* 10.5 acre site is approximately 946' deep.

* State decision was not to allow any project to drain to FM 1092 over 150' deep, because the drainage system running parallel to 1092 is insufficient to carry the additional load.

* The State designed 1092 to only carry rain water 150' on both sides of the street.

It must be stressed that Bel-Go had knowledge of the existence of a 150 foot drainage regulation and that Bel-Go believed this requirement would be waived by the Highway Department because it had been waived in the past. The department's change in policy concerning the enforcement of the 150' drainage regulation created Bel-Go's problem. Bel-Go claims that the defendants had knowledge that the highway department changed its policy as to the 150' drainage waiver prior to or at the time the property was sold, on December 28, 1979. Bel-Go filed suit on December 12, 1980, and in its amended petition alleged fraud and violation of the Deceptive Trade Practices Act.

The sellers and Scarcella both presented motions for summary judgment, and they were granted.

When the movant in a summary judgment is a defendant, he is entitled to prevail on a motion for summary judgment if he establishes, as a matter of law, that there exists no genuine issue of material fact as to one or more elements of plaintiff's cause of action. *Gibbs v. General Motors Corp.*, 450 S.W.2d 827, 828 (Tex. 1970); *Federated Department Stores, Inc. v. Houston Lighting & Power*, 646 S.W.2d 509, 511 (Tex.App.—Houston [1st Dist.] 1982, no writ). Once the defendant has negated, as a matter of law, such elements of plaintiff's cause of action, the plaintiff has the burden of introducing evidence that raises issues of fact with respect to the elements negated by the defendant's summary judgment evidence. *Federated Department Stores, Inc.*, 646 S.W.2d at 511. This evidence must be of probative force. *Woolhouse v. Tolchin Instruments, Inc.*, 601 S.W.2d 106, 108 (Tex.Civ.App.—Dallas 1980, no writ) (citing *Garza v. Allied Finance Co.*, 566 S.W.2d 57, 61 (Tex.Civ.App. —Corpus Christi 1978, no writ)).

In summary judgment proceedings, all of the evidence must be viewed in the light most favorable to the non-movant. All conflicts must be disregarded, and the evidence that tends to support the position of the non-movant is accepted as true. *Montgomery v. Kennedy*, 669 S.W.2d 309, 310–11 (Tex.1984); *see Mostek Corp. v. Chemetron*, 642 S.W.2d 20, 23 (Tex.App.— Dallas 1982, writ dism'd by agr.). Only when the proof establishes that no genuine issues of fact exist and that the movant is entitled to judgment as a matter of law should a summary judgment be granted. *Gibbs v. General Motors Corp.*, 450 S.W.2d 827, 828 (Tex.1970); *Herndon Marine Products v. San Patricio County*, 695 S.W.2d 29, 33 (Tex.App.—Corpus Christi 1985, writ pending); Tex.R.Civ.P. 166–A, sec. c.

After reviewing the summary judgment evidence, including all depositions and affidavits, in the light most favorable to the appellants, we hold that the summary judgment in favor of the appellees should be affirmed.

The appellants contend that the appellees "knew that the the Highway Department had made it more difficult to drain the properties along Murphy Road because the department changed its policy on permitting more than 150 feet of adjoining land to drain into the Highway Department's drainage ditch." Appellants argue that these restrictions prevented them from obtaining a building permit to construct their planned development. The appellants allege common law and statutory fraud, and violations of the Tex.Bus. & Com.Code Ann. secs. 17.46(b)(5), (7), (12) and (23); 17.50(a)(2); 17.50(a)(3) (Vernon Supp.1986).

To recover under either common law or statutory fraud, the appellants must adduce some evidence, direct or circumstantial, that the appellees had knowledge of the Highway Department's change in policy. Similarly, the Deceptive Trade Practices Act sec. 17.46(b)(23) requires proof that the appellees had knowledge of the policy change. Also, the appellants' claims under sec. 17.46(b)(5), (7), and (12) require a showing of the appellees' knowledge, because the only representation that appellees made is contained in paragraph 9(d) of the earnest money contract, which stated that sellers had no knowledge of any matters that would prevent appellants from getting their permit. Additionally, the express warranty claim under 17.50(a)(2) is based on paragraph 9(d), and it was simply a statement disclaiming knowledge. Therefore, all of appellants' claims, with the exception of unconscionability, depend upon whether there is a genuine issue of fact concerning the appellees' actual knowledge of the Highway Department's change in policy.

We note from the record that appellee Dominica Mercatante denied any knowledge of a drainage problem. She claimed she did not learn of a drainage problem until Bel-Go informed her of it. However, she did admit that she had some knowledge that her cousins, Joe and P.T. Failla had had "a little problem too" with drainage, but she claimed she did not learn of this until after the closing. She had been told by her aunt, Stafford city councilwoman Regina Agnello, that "the drainage had been okayed ... but after the sale of the land something came up that the State had something to do about it...." Dominica had been told that "the State came up with some type of law that [anyone with land along F.M. 1092] couldn't drain so much or something or other." Dominica explicitly stated that she had no knowledge of any drainage problems until after the property had been sold.

Victor Mercatante, appellee, stated that he first became aware of drainage problems on the property that prevented the issuance of building permits sometime in 1980, after the sale of the land was complete. He had spoken with councilwoman Regina Agnello, Dominica's aunt and Elizabeth Vitale's sister-in-law, after Bel-Go had filed suit against him. She had informed him that "the State had thrown some wrench in the deal the first of the year." Victor remembered reading through the earnest money contract, but stated that he didn't "specifically remember anything that stuck out in [his] mind because [he] didn't think there would be anything to hinder what [Bel-Go] wanted to build there." He had heard that Bel-Go was having trouble getting a building permit, but he was not sure when he first heard this information. He further stated that he had never had any drainage problems in the 12 years he lived on the property and that he knew the property drained "to the front."

Elizabeth Vitale, appellee, stated that she did not know about any drainage problems and had never discussed drainage problems with anyone.

Scarcella's affidavit claims no knowledge up to the date of closing that would *"prevent"* Bel-Go from receiving a permit because the only thing preventing the issuance of the permit would be a change of policy by the Texas Highway Department, and he had no knowledge of any change prior to closing.

Appellants call this Court's attention to a portion of the deposition testimony of the appellee, Scarcella, as follows:

Alderman Willis suggested the City discuss this matter with the land owners now to avoid additional problems in the future.

I realize you may not know what Alderman Willis had in his mind when he said that. *Do you have any idea of what additional he was talking about than this problem that's further up in the paragraph, the fact that the Highway Department had cut it off at 150 feet?*

A: I would assume—I mean, *based on my recollection of the meeting, that's what he had reference to.*

Q: All right. You do remember this meeting?

A: Generally, yes, sir.

Q: Do you remember generally those items were discussed?

A: Yes, I do. I don't remember Alderman Willis making that particular statement. But I certainly wouldn't say he did not. (Emphasis added.)

A suggestion that the city engineer discussed the matter of the 150′ drainage does not mean that the highway department would not continue to waive their rule to cut off drainage at the 150′ level. This excerpt does not create any reasonable inference that Scarcella was aware of any matter that would "prevent purchaser from obtaining a building permit." This excerpt merely refers to the existing Texas Highway Department policy embodied in the 150′ rule.

Appellants' assertion that Scarcella and the sellers had knowledge that the 150′ rule would not be waived and that they withheld this information, is a conclusion without evidentiary support and relegates it to speculation and conjecture. We find no proof, direct or circumstantial, to support an inference of knowledge.

Zunenshine, on behalf of Bel-Go, states in his deposition that Mr. Gottlieb discussed the project with many people who could have revealed the potential problem; that the people Bel-Go hired conferred with city officials regarding necessary permits; that nobody, including city officials, knew there

would be a problem; and that Zunenshine had no factual basis for believing that Scarcella or the sellers were withholding knowledge at the time the contract was signed.

In a signed affidavit, Gottlieb alleges that on January 8, 1980, the appellants learned that a drainage problem existed that would prevent appellants from receiving a permit from the City of Stafford. From January 8, 1980, until fall 1980, Bel-Go worked with the City of Stafford's engineer and planning director to find a method of drainage that was acceptable and economically feasible. During that period, January 8, 1980, to fall of 1980, Bel-Go became *suspicious* that Scarcella and clients had knowledge of the existence of drainage problems before the earnest money contract *was executed, or prior to closing.*

In support of his *suspicions,* Gottlieb refers to minutes of the City Council meeting of November 1979, when the "city planning director informed the council that drainage was not available for the tracts along F.M. 1092 (which included the tract purchased by the plaintiff) and permits were not available because of such condition" and attached by way of exhibit said minutes of 14 November 1979. The pertinent part of the exhibit reads as follows:

Mr. Vaccaro stated there is a proposal for the development of a ten acre tract on Murphy Road with the only drainage being in the Highway Department's right-of-way. He further stated the State Department of Highways and Public Transportation normally allows property depth of 150 feet to drain into their right-of-way. Mayor Scarcella stated he felt it was the responsibility of the City Engineer to require adequate drainage on tracts as they develop. The City has gone to great lengths to provide adequate major drainage facilities, he commented. The drainage of tracts on Murphy Road was discussed briefly. Mayor Scarcella stated he felt each building permit should provide for adequate drainage. Alderman Willis suggested the City discuss this matter with the land-

owners now to avoid additional problems in the future. Mr. Vaccaro suggested approval from the Highway Department on all plans and permits on Murphy Road.

A careful reading of the minutes does not indicate that a permit will not be given to landowners, only that "permits" provide for adequate drainage and suggesting approval from the Highway Department as to all plans and permits on Murphy Road. This does not tend to show that the Highway Department would not waive the 150' restriction as it had done in the past. Nothing was stated in the affidavit or supporting exhibits that controverted Scarcella's denial of knowledge before the closing, or at the time of closing, that the Highway Department would no longer waive the 150' drainage restriction.

Appellants refer this Court to specific deposition testimony of various witnesses in support of their theory of knowledge on the part of appellees that the State Highway Department had changed its policy relative to waiver of the 150' requirement. At most, the referenced testimony speculates with inferences stacked on inferences, without specific facts tying such inferences of knowledge to the appellees. Stacking of inferences to reach an ultimate conclusion is not allowed. *Briones v. LeVine's Department Store, Inc.*, 446 S.W.2d 7, 10 (Tex.1969).

■ Furthermore, the appellants attempt to rely upon their own answers to interrogatories as purported evidence in opposition to the summary judgment. It is well-settled that answers to interrogatories may be used only against the answering party. When the party opposing a motion for summary judgment has answered interrogatories, those answers cannot be used to defeat the motions on the grounds that they raise a material fact issue. *See, e.g., Walker v. Horine*, 695 S.W.2d 572, 575 (Tex.Civ.App.—Corpus Christi 1985, no writ); *Fort Bend Independent School District v. Weiss*, 570 S.W.2d 241, 243 (Tex. Civ.App.—Houston [1st Dist.] 1978, no writ); *Jeffrey v. Larry Plotnick Co.*, 532 S.W.2d 99, 102 (Tex.Civ.App.—Dallas 1975, no writ); Hittner, *Summary Judgment in Texas*, 22 Hous.L.Rev. 1109, 1122 and nn. 91–92 (1985).

■ We find that there is no genuine issue of material fact as to the element of knowledge required in appellants' causes of actions addressed above.

■ The appellants also claim that the appellees' actions violated sec. 17.45(5) of the Deceptive Trade Practices Act. That section states:

(5) "Unconscionable action or cause of action" means an act or practice which, to a person's detriment:

(A) takes advantage of the lack of knowledge, ability or experience, or capacity of a person to a grossly unfair degree; or

(B) results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration.

Sections (A) and (B) require that the act or practice meet the standard of "grossly unfair" or "gross disparity," respectively. The Texas Supreme Court has held that the word gross "should be given its ordinary meaning of glaringly noticeable, flagrant, complete and unmitigated." *Chastain v. Koonce*, 700 S.W.2d 579, 583 (Tex.1985).

There is no probative evidence in the record that the appellees took advantage of the appellants' lack of knowledge, ability, experience, or capacity to a glaring degree. The appellants knew of the Texas Highway Department's rule that only 150 feet of land could be drained onto a state highway. The appellants were also aware that this rule was often-times waived. Furthermore, the appellants are experienced in land transactions, whereas the appellees are not. Bel-Go is a joint venture composed of Belcourt Construction Company, a large Canadian construction company, and Sam B. Gottlieb, an experienced Houston real estate developer. At the time of this transaction, Mrs. Vitale was an 80–year-old grandmother who lived on the land in question. Her daughter, Mrs. Mercatante, also

lived on the land and was a housewife with a high school diploma. Mrs. Vitale's son-in-law was a nurseryman. It is uncontroverted that the Mercatantes had absolutely no experience in real estate development.

There is also no probative evidence in the record to raise a fact issue on the question of whether there was a gross disparity between the value of the property received and the consideration paid. The appellants point to the appraisal of the property by Joseph R. Stanfield that states that as of December 28, 1979, the market value of the property, if it were ready for immediate development, is $737,400, whereas the market value of the property with a "drainage problem" is $566,500. This is a difference of approximately 23%. The appellants argue that there exists a genuine issue of fact as to whether this 23% "decrease" in value is a "gross disparity."

The appellants' argument is without merit because, based on the record in the present case, the Texas Highway Department did not decide to enforce the drainage restrictions on the property until after the time of purchase. In *Chastain*, the Texas Supreme Court stated that the disparity, if any, between value received and consideration paid is to be determined at the time of purchase. 700 S.W.2d at 582. Therefore, the $566,000 value of the property with a "drainage problem" relied on by the appellants is not the value of the property at the time of purchase. Rather, the value of the land at the time of purchase, according to appellants' own expert, was $737,400. The appellants paid $737,383.68. Therefore, there is no disparity, let alone a gross disparity, as a matter of law.

The judgment of the trial court is affirmed.