Joe A. POE, et al, Appellants,

v.

G. Russell HUTCHINS, et al, Appellees.

No. 05–86–00106–CV.

Court of Appeals of Texas,
Dallas.

June 9, 1987.

Rehearing Denied July 17, 1987.

Charles R. Griggs, Sweetwater, for appellants.

Jack Pew, Jr., Dallas, for appellees.

Before STEPHENS, STEWART and BAKER, JJ.

STEWART, Justice.

Appellees, plaintiffs below, leased two oil rigs and purchased two others from appellants, defendants below. Alleging numerous causes of action, plaintiffs sued defendants over disputes originating with the rig leases and purchases. Defendants responded with a counterclaim in which they sought the unpaid rent on the leases and recoveries for monies advanced and services performed. On balance, the jury and trial court ruled in favor of defendants. Defendants appealed seeking a larger and broader judgment. Plaintiffs cross-appealed seeking to reduce the judgment and to recover in their own right. We affirm in part, reverse and render in part, and reverse and remand in part.

George Poe and Joe Poe were oil businessmen at all times relevant to this action. They created Sweetwater Drilling Company, Incorporated (Sweetwater (corp.)) in 1975. In 1981 they created the partnership called Sweetwater Drilling Company (Sweetwater (part.)). Sweetwater (corp.) managed oil and gas production primarily; Sweetwater (part.) owned and operated drilling rigs. When referring to the Poes and their entities collectively, we refer to them as "the Poe group."

Sweetwater (part.) took over all the drilling equipment belonging to Sweetwater (corp.). In time Sweetwater (part.) sold all

its then-owned drilling rigs to Cothrum Drilling Company. Sweetwater (part.) then began to reassemble other rigs for use and resale. Sweetwater (part.) acquired or assembled the four drilling rigs with which this litigation is concerned. We refer to these rigs as the National rig, the Brewster rig, the Challenger rig, and the Emsco rig.

The plaintiffs in the trial court and the appellees here are G. Russell Hutchins (Russell), Frank L. Romero (Romero), Jerome R. Hutchins (Robert), and First United Drilling, Incorporated (First United). Mark D. Taylor (Taylor) was an intervenor in the trial court and is an appellee here. The position of Taylor as an intervenor and as an appellee is identical to that of appellees Russell, Romero, Robert, and First United. When referring to Russell, Romero, Robert, First United, and Taylor collectively, we refer to them as "the First United group."

Taylor was a Mercedes car salesman. Through a series of car deals with Joe Poe, he learned that Joe Poe was engaged in the oil and gas business. In 1983, he left his occupation as a used car dealer, and he and Joe Poe created XPLOR Petroleum Corporation (XPLOR; pronounced "explore"). XPLOR was created for the purpose of enabling Taylor to learn the oil and gas business. Joe Poe owned sixty percent of XPLOR, and Taylor owned forty percent.

Taylor introduced Russell to Joe Poe, and through Joe Poe, Russell began investing in oil and gas ventures. Some ventures succeeded; others did not.

Later Russell, Robert, Romero, and three members of the Turboff family considered entering the area of exploration and acquiring drilling rigs. The vehicle for the rig purchase was to be a corporate entity known as First United Drilling, Incorporated. However, the three Turboffs eventually declined to participate. On August 31, 1983, First United was chartered as a Texas "close corporation." The ultimate shareholders were Russell, Robert, Romero, and Joe Poe. Each shareholder took a twenty-five percent interest. Subsequently, Taylor acquired one-fourth of Joe Poe's interest, or a six and one-fourth percent interest in the company overall. From the beginning, Joe Poe functioned as chief operating officer of the company, although he did not assume the title of president until March 28, 1984. On September 30, 1983, Joe Poe entered an employment contract with First United; he agreed his duties would "include the daily management, operations and supervision of an oil and gas drilling business."

Also on September 30, 1983, First United purchased the Brewster rig from Sweetwater (part.) for $3,200,000 and on December 23, 1983, First United purchased the National rig from Sweetwater (part.) for $1,600,000. Joe Poe represented that both the National and Brewster rigs were "complete." At trial, Joe Poe testified that he priced the National and Brewster rigs to others at $100,000 less per rig than they were priced to First United. Joe Poe explained that Taylor wanted to make a commission of $100,000 per rig and that he told Taylor "to add it on the prices I [gave] him, and that's what the prices were that First United got." Taylor deposited the commissions to the XPLOR bank account.

Additionally, Sweetwater (part.) leased the Emsco rig on September 29, 1983, and the Challenger rig on December 29, 1983, to First United. The inventory of the Emsco rig represented that virtually all of the equipment was new; Joe Poe admitted this was untrue. With respect to the Challenger rig, there was evidence that Joe Poe represented it to be in good condition and that, according to the First United group, it was not in good condition.

Sweetwater (part.) assigned the leases covering the Emsco and Challenger rigs to Sweetwater (corp.), which, in turn, assigned them to General Discount Corporation (General Discount), which, sometime during trial, reassigned the leases back to Sweetwater (corp.). At trial, the Poe group introduced these two reassignments into evidence without objection by the First United group.

In the special issues, the First United group asserted four causes of action against the Poe group: (1) deceptive trade practices, (2) breach of express warranties,

(3) fraud, and (4) breach of fiduciary duty. The Poe group presented the following defensive issues and counterissues: (1) waiver by the First United group, (2) breach of the rig lease contracts by the First United group, and (3) the First United group owed XPLOR, Joe Poe, George Poe, and Sweetwater (part.) money by reason of services rendered and money advanced to First United. After both parties had presented all their evidence and had closed, the Poe group moved the court for permission to file a trial amendment "asserting a cause of action on behalf of the defendant Sweetwater Drilling Company, Inc. [i.e., Sweetwater (corp.)] for the recovery of unpaid lease payments on the leased rigs...." This trial amendment was necessitated when General Discount reassigned the Emsco and Challenger leases to Sweetwater (corp.) and not to Sweetwater (part.). The trial court granted this motion.

Forty-four special issues were submitted to the jury. Based upon the jury answers to these special issues, the trial court rendered the following judgment: (1) First United was awarded a $15,000 judgment against Joe Poe for breach of fiduciary duty, (2) XPLOR was awarded a $66,135 judgment against First United for services performed and money advanced by XPLOR for the benefit of First United for which no repayment had been made, (3) Joe Poe, George Poe, and Sweetwater (part.) were awarded a $125,000 judgment against First United for money advanced by Sweetwater (part.) to First United that had been neither repaid nor credited, and (4) Sweetwater (corp.) was awarded a $650,000 judgment, representing ten months of unpaid lease payments on the Emsco and Challenger rigs, against First United. The trial court denied all other relief.

The Poe group presents four points challenging the fourth portion of the judgment awarding Sweetwater (corp.) $650,000 for unpaid lease payments against First United. The Poe group contends that they are entitled to more than $650,000 and that they are entitled to judgment not only against First United but also against Russell, Robert, Romero, and Taylor, jointly and severally.

The First United Group brings nine cross-points. They contend that they owe the Poe group nothing on the leases because Joe Poe violated the DTPA, committed fraud, and breached his fiduciary duties, and, to the contrary, due to these acts, Sweetwater (part.) owes them $140,-000. In the alternative, they argue that they are entitled to a new trial because the trial court improperly permitted the trial amendment naming Sweetwater (corp.) as a cross-plaintiff. The First United group also argues that Joe Poe violated the DTPA, committed fraud, and breached his fiduciary duties with regard to the $100,000 commissions paid to Taylor on the sale of the National and Brewster rigs, and that, consequently, the First United group is entitled to $200,000 plus attorney's fees for these violations. Alternatively, they seek a new trial with regard to both the National and Brewster rigs. Finally, the First United group maintains there is no evidence supporting the jury findings that form the basis of the $66,135 award in favor of XPLOR and the $125,000 award in favor of Joe Poe, George Poe, and Sweetwater (part.).

## I. POE GROUP'S POINTS OF ERROR

### A. THE FIRST UNITED GROUP'S JOINT AND SEVERAL LIABILITY

In their first point of error, the Poe group contends that the trial court erred in failing to award money damages to Sweetwater (corp.) against not only First United but also against Russell, Romero, Robert, and Taylor, jointly and severally. Their second point raises the same complaint with regard to the trial court's failure to grant their motion for modification of the judgment. For the reasons given below, we overrule the Poe group's first two points of error.

In the Poe group's supplemental pleading, the pleadings upon which they proceeded to trial, they alleged that they leased the Emsco and Challenger rigs to First United and that performance of the lease agreements was guaranteed individually by Russell, Romero, Robert, and Taylor. The trial

court rejected this guarantor theory; the Poe group brings no point of error complaining of this ruling.

■ On appeal, the Poe group argues that Russell, Romero, Robert, and Taylor signed the leases, not as guarantors, but as lessees. The First United group responds that appellants are limited to those theories upon which they tried the case and may not appeal the case on a new or different theory. *Davis v. Campbell*, 572 S.W.2d 660, 662 (Tex.1978); *Hilsher v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 717 S.W.2d 435, 441 (Tex.App.—Houston [14th Dist.] 1986, no writ). We agree with the First United group. The Poe group's first two points of error are overruled.

### B. MATHEMATICAL CALCULATION ON AMOUNT OF LEASE PAYMENTS DUE

In their third point, the Poe group contends that the trial court erred in its mathematical calculation of the money damages awarded to Sweetwater (corp.) in that the recovery should not have been for $650,-000; rather, it should have been for $3,420,000. They argue (1) there is no evidence to support the award of $650,000, and (2) the award of $3,420,000 is mandated because the parties so stipulated. In point four, the Poe group argues that the trial court erred in failing to grant their motion to modify the judgment for the same reasons. We overrule both points.

The Poe group first points the Court to the stipulation between the parties that no lease payments were made on the Emsco and Challenger rigs after June 1, 1984. Next they illustrate that (1) the amount of the total payments due on the Emsco and Challenger rigs is $3,900,000, (2) the amount of the payments made on both rigs is $545,000, and (3) the difference between $3,900,000 and $545,000 is $3,355,000. They request an additional $65,000 in prejudgment interest to bring the total amount to $3,420,000, as asserted in their third and fourth points. Finally, the Poe group relies on special issue forty, wherein the jury found that First United had made known to Sweetwater (corp.) that it did not intend to make any further payments under the rig lease agreements. They argue that special issue forty establishes an absolute repudiation and, thus, First United anticipatorily breached the lease agreement.

■ The First United group responds that a claim of anticipatory breach has three elements. They are: "(1) The defendant absolutely repudiated the obligation, (2) without just excuse, [and] (3) plaintiff was damaged thereby." *Taylor Publishing Co. v. Systems Marketing, Inc.*, 686 S.W.2d 213, 217 (Tex.App.—Dallas 1984, writ ref'd n.r.e.). They argue that there is no jury finding that the repudiation was without just excuse; consequently, the element is deemed to have been found against the Poe group by the trial court's judgment pursuant to rule 279 of the Texas Rules of Civil Procedure, provided there is some evidence to support the finding thereon. As evidence to support the deemed finding of just excuse, they point to the fact that the rigs had been pledged and the leases assigned to General Discount to insure indebtedness of the Poes, that since July 1984 the Poes were in default on their indebtedness to General Discount, and that Sweetwater (corp.) admitted General Discount had the right to immediate possession of the Challenger rig and General Discount had in fact repossessed the Emsco rig in October 1984.

We agree with the First United group. The Poe group needed a jury finding on the "without just excuse" element. As the judgment is against the Poe group on this issue, this element is deemed found accordingly. There is sufficient evidence to support the deemed finding of First United's "just excuse": General Discount had the right to repossess one rig and had in fact repossessed the other. Because the Poe group relied upon this issue, they were required to request it in writing. Having failed to do so, it must be deemed in such a manner as to support the judgment. TEX. R.CIV.P. 279 (Vernon 1977).

In the Poe group's third point, they argue that there is no evidence to support the $650,000 award. However, the judgment specifically provides that the amount re-

flects ten months of lease payments on the Emsco and Challenger rigs, which corresponds to the time from June 1984, when First United last paid the leases, until the time of judgment, April 1985. Points of error three and four are overruled.

## II. FIRST UNITED GROUP'S CROSS–POINTS

### (A) SWEETWATER (CORP.)'S RECOVERY ON THE LEASES

In the First United group's first cross-point, they argue that the trial court erred in awarding Sweetwater (corp.) $650,000 in damages for payments due under the Emsco and Challenger leases. For the reasons given below, we overrule the First United group's first cross-point.

#### (1) EMSCO LEASE

First United argues that Joe Poe was its agent by virtue of his being its manager and was, therefore, its fiduciary. We agree. *West v. Touchstone*, 620 S.W.2d 687, 690 (Tex.Civ.App.—Dallas 1981, error ref'd n.r.e.).

■ First United next argues that the jury's findings that Joe Poe induced First United to enter the Emsco lease through DTPA violations and fraudulent representations constitute a breach of Joe Poe's fiduciary duty to First United. A fiduciary will not be allowed to retain proceeds arising from a violation of his fiduciary duty. *See International Bankers Life Insurance Co. v. Holloway*, 368 S.W.2d 567, 576 (Tex.1963). Therefore, argues First United, as successor in interest to Joe Poe, Sweetwater (corp.) may not recover under the lease.

■ We disagree that Sweetwater (corp.) is a successor in interest to Joe Poe individually. The partnership, not Joe Poe, was the lessor of the rigs in the leases. A partnership is recognized as an entity legally distinct from its partners for most purposes. *Haney v. Fenley, Bate, Deaton & Porter*, 618 S.W.2d 541, 542 (Tex.1981). Consequently, the partnership, not Joe Poe, leased the Emsco and Challenger rigs to First United. The partnership then assigned the leases to Sweetwater (corp.), which in turn assigned them to General Discount, which reassigned them back to Sweetwater (corp.) at some point during the trial. Thus, Sweetwater (corp.) is successor in interest to Sweetwater (part.), not to Joe Poe individually, and the corporation would be subject to First United's defenses against the partnership but not First United's defenses against Joe Poe individually. *See Vogt v. Jones*, 396 S.W.2d 539, 540 (Tex.Civ.App.—Fort Worth 1965, no writ); 7 TEX.JUR.3d *Assignments* § 52 (1980); 6A C.J.S. *Assignments* § 95 (1975). Because Joe Poe, individually, is nowhere in the chain of assignments, any breach of fiduciary duty by him has no bearing on whether Sweetwater (corp.) may recover on the leases.

#### (2) CHALLENGER LEASE

The First United group argues that the judgment for unpaid payments under the Challenger lease should be stricken because a fiduciary has the burden of proving the fairness of a transaction, *Holloway*, 368 S.W.2d at 576, and although the jury did not find DTPA violations or fraud in connection with the Challenger lease, there is no finding that the Challenger lease was fair to First United. This argument has no merit with respect to whether Sweetwater (corp.) can recover on the lease. Joe Poe is the only person alleged to have a fiduciary relationship with First United and any burden he may have failed to meet would not affect the corporation's right to recover, because we have already held that it is not a successor in interest to Joe Poe. Cross-point one is overruled.

### (B) THE EMSCO RIG AND DAMAGES

Because the jury found that Joe Poe, George Poe, and Sweetwater (part.) violated the DTPA and committed fraud in connection with the Emsco lease, the First United group argues in its second cross-point that the trial court erred in refusing to award it damages of $140,000 or, in the alternative, $70,000, together with attor-

ney's fees, against Joe Poe, George Poe, and Sweetwater (part.).

The Poe group responds that First United may not rely upon the DTPA violations found in issue one because the jury found in issue thirty-nine that First United had waived its DTPA claim. Further, they argue that neither jury findings nor the judgment support First United's DTPA or fraud causes of action because (1) damages are a necessary element under both theories of recovery, (2) damage issues thirty-six and thirty-seven do not refer to either issue one or twenty-three, the fraud liability issue, and (3) pursuant to rule 279 of the Texas Rules of Civil Procedure, the damage issues must be deemed to support the judgment, which denies First United any damages for the DTPA violation or fraud.

■ The first issue we address is whether First United waived its DTPA claim. Section 17.42 of the DTPA provides that any waiver by a consumer of the provisions of the DTPA is contrary to public policy and is void. TEX.BUS. & COM.CODE ANN. § 17.42 (Vernon Supp.1987). However, the Poe group contends that this section applies only to contractual waiver that a supplier of goods and services may try to impose on a consumer. They argue that section 17.42 does not address a waiver based exclusively upon the voluntary conduct of the consumer. The Poe group relies upon *McCrea v. Cubilla Condominium Corp. N.V.*, 685 S.W.2d 755 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r. e.), and *Rocha v. U.S. Home/Homecraft Corp.*, 653 S.W.2d 53 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.).

The precise holding in *McCrea* was that when a contract specifically provides that no express or implied warranties are made, a cause of action for breach of express or implied warranties under either the DTPA or contract law has been waived. *McCrea*, 685 S.W.2d at 758. Our present question does not involve a contractual waiver of an express or implied warranty. *McCrea* does not address whether a consumer may waive a DTPA claim by subsequent conduct. We do not find *McCrea* in point.

In *Rocha*, at the trial the consumer conceded that he was not seeking treble damages and induced the judge not to submit any issues relating thereto. On appeal, the consumer argued that the trial court erred in not trebling damages and cited section 17.42 for the proposition that a DTPA claim may not be waived. The court held that section 17.42 does not apply when a consumer insists in open court that he does not want treble damages. In dicta, the court said, "The section in question was clearly intended to void any attempt by a consumer to agree, in the relevant contract, to release any claim which they [sic] may have under the statute." *Rocha*, 653 S.W.2d at 56–57. Neither the court's holding nor dicta in *Rocha* squarely addresses our question. *Rocha* is not in point.

First United directs our attention to *MBank Fort Worth, N.A. v. Trans Meridian, Inc.*, 625 F.Supp. 1274 (N.D.Tex.1985). In that case, MBank argued that section 17.42 applies only to contractual waivers and not to post-transactional waivers, such as the consumer's subsequent conduct with MBank. The court addressed and discounted *Rocha*. The court held that section 17.42 precluded MBank from asserting the defense of waiver. The court noted that the DTPA is a broad remedial statute that is to be liberally construed to promote its underlying purpose and that section 17.42 was drafted in a manner consistent with this purpose. *Id.* at 1284. Furthermore, the court stated that if the Texas legislature wanted to draft a narrow antiwaiver provision, it knew how to do so. *Id.* n. 16 (citing TEX.REV.CIV.STAT.ANN. art. 5069–6.05(4) (Vernon 1985)).

We agree with the *MBank* decision. We hold that section 17.42 prohibits the Poe group from asserting that First United's subsequent conduct constitutes a waiver of its DTPA claim.

■ At this juncture, First United contends that it is entitled to $140,000 or, in the alternative, $70,000 in damages, together with attorney's fees. First United relies upon special issues thirty-six and thirty-seven. Due to the nature of the Poe group's response, we quote issues thirty-

six and thirty-seven, along with the jury answers, in their entirety:

## SPECIAL ISSUE NO. 36

What do you find from a preponderance of the evidence was the actual loss to First United Drilling as a direct and proximate result of the actions and conduct of the Defendants with respect to the following:

Answer in dollars and cents, if any.

| | | |
|---|---|---|
| (a) | Lease of the National Rig | $ -0- |
| (b) | Lease of the EMSCO Rig | $ 70,000 |
| (c) | Lease of the Challenger Rig | $ -0- |
| (d) | Improvements made to and equipment purchased for and repairs to the Rigs which would not otherwise have been necessary had the Rigs been as represented | $125,000 |

## SPECIAL ISSUE NO. 37

What sum of money do you find from a preponderance of the evidence should be awarded to First United Drilling to compensate it for loss of use attributable to repairs and improvements which would not have been necessary had the Rigs been as represented, with respect to each of the following drilling rigs?

Answer in dollars and cents, if any.

| | | |
|---|---|---|
| (a) | National Rig | $ -0- |
| (b) | Brewster Rig | $ -0- |
| (c) | EMSCO Rig | $ 70,000.00 |
| (d) | Challenger Rig | $ -0- |

The Poe group's first contention is that because neither issue thirty-six nor thirty-seven are conditionally linked to any of the earlier issues and because neither damage issue is necessarily or even inferentially referable to earlier issues, the amounts listed under issues thirty-six and thirty-seven may not refer to damages for which the law provides compensation. However, this argument ignores the appellate court duty to sustain the judgment of the trial court if it is correct under any theory of the law applicable to the case. *Custom Leasing, Inc. v. Texas Bank & Trust of Dallas*, 516 S.W.2d 138 (Tex.1974).

Although issues thirty-six and thirty-seven do not explicitly condition themselves to the earlier issues, it is apparent they implic-itly condition themselves upon an earlier finding of some violation. It is doubly apparent that the jury so read them, as the jury awarded damages only on the Emsco rig and refused to award damages for the National, Challenger, and Brewster rigs. Significantly, the only earlier violation the jury found was with respect to the Emsco rig in issues one and twenty-three. Therefore, we find no merit in the Poe group's contention.

Their final contention is that the $70,000 amounts found in issues thirty-six and thirty-seven are probably attributable to the same damage and that, therefore, a recovery of $140,000 would entail a double recovery. We disagree. The conclusion that the jury based its answer to issue 36(b) on the damages found from loss of use of the rigs in issue 37(c), or vice versa, is pure speculation. We could as well speculate that the jury based its answer to issue 36(b) on its answer to issue 36(d),[1] by allocating $70,000 of the $125,000 found to the Emsco rig. However, we are prohibited from delving into the mental processes of the jurors. *Texaco, Inc. v. Haley*, 610 S.W.2d 224, 226 (Tex.Civ.App.—Houston [14th Dist.] 1980, no writ). Further, when the Poe group filed their motion for judgment on the verdict, they conceded that the answers to all special issues were supported by the evidence. *Wilson v. Burleson*, 358 S.W.2d 751, 753 (Tex.Civ.App.—Waco 1962, writ ref'd n.r.e.). Therefore, we hold that the answers to issue 36(b) and 37(c) do not amount to a double recovery.

We hold that the trial court erred in failing to award First United $140,000 from Joe Poe, George Poe, and Sweetwater (part.) for damages attributable to their DTPA violations and misrepresentations in relation to the Emsco rig. Consequently, First United is also entitled to recover attorney's fees under the act. *McKinley v. Drozd*, 685 S.W.2d 7, 8–9 (Tex.1985). We sustain its second cross-point and remand the matter of its attorney's fees to the trial court for determination.

1. First United has not appealed the trial court's failure to award it damages based on the jury's answer to this issue.

## (C) THE TRIAL AMENDMENT ALLOWING SWEETWATER (CORP.) TO RECOVER ON THE EMSCO AND CHALLENGER LEASES

In the alternative to cross-point one wherein First United argued it owed Sweetwater (corp.) nothing on the leases, First United argues in its third cross-point that it is entitled to a new trial on the Challenger and Emsco leases because the trial court erroneously permitted a trial amendment naming Sweetwater (corp.) as the cross-plaintiff. First United contends that the trial court gravely prejudiced its case by permitting the trial amendment after the evidence had been concluded. First United cites but one authority: *Meeks v. Bell*, 710 S.W.2d 789 (Tex.App.—Fort Worth 1986, writ granted).

In *Meeks*, the plaintiffs (the Bells) proceeded to trial on the theories of negligence and breach of express and implied warranty. The jury findings negated both negligence and breach of warranty claims. Eleven days after the jury verdict was rendered, the trial court allowed a trial amendment wherein the plaintiffs alleged a claim for misrepresentation. The trial court then entered judgment in the amount of $211,893.08 in favor of plaintiffs. The Fort Worth Court of Appeals held that the trial court abused its discretion in allowing the trial amendment because the defendant was prejudiced in maintaining his defense; the defendant "was not on notice that he needed to cross-examine witnesses and develop a defense regarding the issue of misrepresentation." *Meeks v. Bell*, 710 S.W.2d at 794.

The Poe group replies that during the trial the lease assignments to Sweetwater (corp.) were admitted into evidence without objection, that the trial amendment merely named the proper party in interest under the leases, and that the theory of recovery—unlike in *Meeks*—and First United's defensive theory were left unchanged; consequently, First United was not prejudiced in maintaining its defense. Furthermore, pursuant to rule 66 of the Texas Rules of Civil Procedure, had there been any true prejudice to First United's maintaining its defense, the Poe group argues that the proper remedy would have been for First United to request a postponement to enable it to meet the new evidence or theory of recovery, but it did not do so.

The question of permitting a trial amendment is left to the sound discretion of the trial court and its decision will not be disturbed on appeal unless an abuse of discretion clearly appears. *Yowell v. Piper Aircraft Corp.*, 703 S.W.2d 630, 634 (Tex. 1986). An abuse of discretion is shown when the objecting party is prejudiced in maintaining his action or defense. TEX.R. CIV.P. 66. The rule provides that the court shall "freely" allow a trial amendment if to do so will subserve the "presentation of the merits of the actions" and the objecting party fails to satisfy the court that the amendment will prejudice him in maintaining his action or defense on the merits. *Id.; Vermillion v. Haynes*, 147 Tex. 359, 365, 215 S.W.2d 605, 609 (1948). Under rule 63 of the Texas Rules of Civil Procedure, the burden of convincing the trial court that the late filing of an amended pleading will operate as a surprise rests on the party resisting the filing of that pleading. TEX.R.CIV.P. 63; *Alstan Corp. v. Board of Administration of Chimney Corners Townhouses*, 713 S.W.2d 130, 132 (Tex.App.—Austin 1986, no writ).

We hold that the trial court did not abuse its discretion by permitting the filing of the trial amendment. On appeal, First United bases its defense to liability on the leases upon the jury finding of DTPA violations and fraud by George Poe, Joe Poe, and Sweetwater (part.) and upon Joe Poe's breach of his fiduciary duty. However, Sweetwater (corp.) was included in First United's DTPA and fraud issues, but the jury gave negative answers to these issues with respect to the corporation. Thus, First United's same potential defense against liability to Sweetwater (corp.) on the leases was litigated in the trial court. First United does not maintain that it had a different defense against Sweetwater (corp.) on the leases than it had against the other defendants. Consequently, First United was not prejudiced in maintaining

its defense by the granting of the trial amendment after the evidence was closed. The amendment merely named the proper party in interest under the leases to conform to the proof established by the admission without objection of the reassignments. Allowing the trial amendment subserved the presentation of the merits of the action. First United, upon whom the burden of persuasion falls, has failed to show a clear abuse of discretion. First United's third cross-point of error is overruled.

### (D) FIRST UNITED'S NATIONAL AND BREWSTER CROSS–POINTS

Cross-points four through seven address the sale of the National and Brewster rigs to First United. Cross-points four and five address the $100,000 commissions to Taylor on the sale of the National and Brewster rigs; First United contends that the commissions establish as a matter of law a violation of the DTPA and a breach of Joe Poe's fiduciary duty to First United, and, alternatively, the jury findings of no DTPA violation and no fraud by Joe Poe with respect to the National and Brewster rigs are contrary to the great weight and preponderance of the evidence. Cross-points six and seven argue that the jury findings that the National and Brewster rigs were complete as represented by Joe Poe, George Poe, and Sweetwater (part.) are contrary to the great weight and preponderance of the evidence.

### (1) TAYLOR'S COMMISSIONS

Before First United was formed and while the three members of the Turboff family were still considering acquiring oil rigs with Russell, Robert, and Romero, Taylor approached Joe Poe and informed him that Russell Hutchins and his two partners were interested in buying a rig. Joe Poe testified that Taylor knew he was trying to sell some rigs.

On direct examination, Joe Poe's attorney asked him:

Let me stop at that point and ask you if prior to the time you talked to Mr. Taylor about selling the rigs, about the possibility of selling the rigs, had you priced any of those rigs to any other parties prior to that time?

A. Yes, sir.

....

Q. Well, let's talk about the Brewster for a minute. To whom had you quoted prices about a possible sale of the Brewster rig, if you recall?

A. I had priced it to several people, just brokers around the country. I remember a few of them but not many.

....

Q. When you were pricing the Brewster rig to other parties, what price had you put on it as an assembled rig?

A. I believe in the neighborhood of $3.1 million.

....

Q. All right. From start to finish, did you ever make any substantial variation with anybody, including First United, about what the price was going to be on the Brewster rig?

A. The same parts that I priced everybody else were $100,000 a rig higher to First United than anyone else, I believe.

Q. Is there a reason for that?

A. Mr. Taylor told me he would like to make $100,000 per rig commission.

Q. All right. When he told you that he would like to make a commission, what did you say to him?

A. I told him, you know, that he would just have to add it on the prices I [gave] him, and that's what the prices were that First United got.

Q. What about your National 50? Had you quoted it to any other parties before you talked to Mr. Taylor about selling it?

A. I'm sure that I had.

Q. Do you remember any specific offerings?

A. I think I had talked to a broker down in Louisiana by the name of Rambo.

Q. Do you recall what kind of price you put on the National 50 to Mr. Rambo?

A. It was a Larry Rambo, and I believe it was a million and a half, in that neighborhood.

Q. All right. After you had—by the way, your first discussion about rig sales

with Mr. Taylor, was it a detailed discussion, or did you just talk in general terms?

A. Just in general terms.

The jury found in special issue thirty-four that the fair market value of the Brewster rig on the date First United purchased it was $3,200,000 and that the fair market value of the National rig on the date First United purchased it was $1,585,-000. Consequently, as far as the jury was concerned, in a $4.8 million deal the difference between the fair market value of the rigs that First United purchased and the price it actually paid for them was only $15,000.

In its fourth and fifth cross-points, the First United group contends that Joe Poe breached his fiduciary duty to it, because (1) Joe Poe admitted, without retraction or qualification, that he priced the National and Brewster rigs at a price $100,000 higher per rig than he would have priced them to anyone else, (2) Joe Poe did not inform First United of the commissions, and (3) Taylor deposited the commissions to the account of XPLOR, a corporation in which Joe Poe owned a sixty percent interest. First United argues that the trial court erred in refusing to award it damages in the amount of $100,000 per rig.

The Poe group replies that Joe Poe was not a fiduciary when he initially priced the rigs; that Taylor instigated the commission; that Joe Poe simply made a price to Taylor as the go-between and Taylor added the $100,000 to the purchase price. Consequently, argues the Poe group, Joe Poe did not breach any fiduciary duty to First United.

The only fiduciary duty issues submitted to the jury were issue numbers twenty-nine through thirty-two, none of which ask about any breach by Joe Poe with respect to the Brewster or National rigs. First United failed to request or have submitted any issues regarding a breach of fiduciary duty on the sale of the Brewster and National rigs. "Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and upon which no issue is given or re-quested shall be deemed as waived...." TEX.R.CIV.P. 279. Consequently, the only question before us is whether First United conclusively established a breach of fiduciary duty.

Corporate officers and directors are fiduciaries. *Holloway,* 368 S.W.2d at 576. *Holloway* further states that contracts between a corporation and its officers or directors are not void but they are voidable for unfairness and fraud; that the burden is upon the fiduciary to prove fairness; that transactions in which a corporate fiduciary derives personal profit are subject to the closest examination; *id.* at 577; that a director of a corporation is held to the extreme measure of candor, unselfishness, and good faith; that those principles are rigid, essential, and salutary; and that a director or officer who diverts profits from the corporation in violation of his fiduciary relationship is personally liable even though the profits are acquired by a corporation controlled by the director. *Id.*

Applying the above to our facts, Joe Poe, as manager and shareholder of First United, a close corporation, was a fiduciary of First United. The burden was upon Joe Poe to prove the fairness of the transaction. Employing "the closest examination" and using "the extreme measure of candor, unselfishness, and good faith," we hold that although there is some evidence that Joe Poe breached his fiduciary duty, the evidence does not conclusively establish, as a matter of law, that Joe Poe breached his fiduciary duty to First United. In a $4.8 million deal, the jury found that First United paid only $15,000 over the fair market value. Further, the jury found that the fair market value of the rigs as represented and in fact was the same. The First United group does not attack the jury's findings regarding the fair market value of the Brewster and National rigs. These findings support the fairness of the transaction and preclude this Court from stating that the transaction was unfair as a matter of law.

■ However, cross-points four and five also argue, in the alternative, that the jury findings of no DTPA violations and no fraud by Joe Poe with respect to the National and Brewster rigs are contrary to the great weight and preponderance of the evidence. The First United group contends that the $100,000 commissions paid to Taylor on the sales of the National and Brewster rigs constitute a violation of the DTPA and fraud.

The Poe group responds that the First United group hired an independent appraiser, Philip T. Parker, to physically inspect the National and Brewster rigs before any sale was made. In his written report, Parker appraised the Brewster rig at $1,261,000 and the National rig at $329,000. One week later First United purchased the Brewster rig for $3,200,000, and shortly thereafter, First United purchased the National rig for $1,600,000. The Poe group then asserts that when a person undertakes an independent investigation and relies on it, redress for a fraudulent representation is no longer available. 41 Tex. Jur.3d *Fraud and Deceit* § 54 (1985). The Poe group adds: "If a party ... does make such an investigation ... and is not hindered or prevented from doing so by any act of the other party, it must be held as a matter of law that he has knowledge of everything that a proper investigation would disclose." *Id.* Therefore, argues the Poe group, there is no evidence of reliance on Joe Poe's representations because the First United group, as a matter of law, had knowledge of the actual dollar value of the Brewster and National rigs at the time they entered into the transaction. Whether a finding is against the great weight and preponderance of the evidence is a factual sufficiency question, and when reviewing factual sufficiency questions, we must consider all the evidence, *Burnett v. Motyka,* 610 S.W.2d 735, 736 (Tex.1980), that is, evidence both in support of and contrary to the jury's findings. *Dyson v. Olin Corporation,* 692 S.W.2d 456 (Tex. 1985); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951). Examples of jury findings that are against the great weight of the evidence are findings that are manifestly unjust, that shock the conscience, and that clearly demonstrate bias. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g).

Assuming the prices were excessive, by virtue of their own independent appraiser, First United knew this before purchasing the rigs. This bars relief for fraud. *Allen v. Lasseter,* 35 S.W.2d 753 (Tex.Civ.App.— Waco 1931, writ ref'd). Furthermore, the jury found the prices paid were fair, because they found a *de minimus* difference in fair market value and First United's purchase price. We hold that the jury findings of no DTPA violation and no fraud in connection with the National and Brewster rigs are not against the great weight and preponderance of the evidence. First United's fourth and fifth cross-points are overruled.

## (2) JURY FINDINGS THAT THE NATIONAL AND BREWSTER RIGS WERE COMPLETE

■ In cross-points six and seven First United argues that the trial court erred in refusing to grant a new trial as to the National and Brewster rigs because the jury findings that both rigs were complete as represented by Joe Poe, George Poe, and Sweetwater (part.) were contrary to the great weight and preponderance of the evidence. In special issue six the jury found that Joe Poe, George Poe, and Sweetwater (part.), but not Sweetwater (corp.), made an express warranty that the National and Brewster rigs were complete. In issue seven, they found that both the National and Brewster rigs were in fact complete when purchased by First United.

First United contends that these answers are against the great weight and preponderance of the evidence because, allegedly, the undisputed evidence is that neither the National rig nor the Brewster rig had a blowout preventer, which is essential for drilling in Oklahoma. The cost of acquiring the blowout preventers was $398,826. They also point to evidence that the mud mixing equipment on the National rig was broken beyond repair and that the pipe

for the Brewster rig, although new, was brittle and had to be discarded.

The Poe group answers that the evidence showed that there is no standard meaning for the word "complete" as applied to drilling rigs; that, although they objected to these issues for lack of a definition of "complete," the court refused to include one; consequently, the charge invited the jury to speculate on the meaning of "complete." They contend, nevertheless, that there was sufficient evidence to support the jury's answers; therefore, these cross-points should be overruled. We agree.

As stated earlier, whether a jury finding is against the great weight and preponderance of the evidence is a factual sufficiency question, and when determining such questions, we must review all the evidence. *Dyson,* 692 S.W.2d at 456. The record reflects that Joe Poe furnished the First United group written inventories of the component parts of the two rigs before the transaction was put in final form. The First United group in turn gave their independent appraiser, Parker, an inventory of the component parts. Parker made a physical inspection of the two rigs and prepared an itemized appraisal of the component parts, which was admitted in evidence. Parker mailed the appraisal to First United's law firm on September 21, 1983. First United purchased the Brewster rig on September 30, 1983, and the National rig on December 23, 1983. The jury could have concluded that First United knew exactly which component parts they were purchasing in the transaction and that they were receiving exactly what Joe Poe said he would deliver. Consequently, the jury, in the absence of a definition of "complete," was justified in returning their verdict that the rigs were complete as expressly warranted.

Further, the appraisal prepared by Parker lists a blowout preventer for the Brewster rig but not for the National rig. A blowout preventer was also listed among the items that Parker did not inspect. The description of the blowout preventers seen and not seen are nearly identical. This contradicts First United's assertion that both rigs lacked blowout preventers.

As for the mud mixing equipment on the National rig that First United alleges was broken beyond repair, Parker's appraisal for the National rig lists "1 Complete 650 BBL Mud System" and values it at $5,500. With regard to the pipe for the Brewster rig that was brittle and had to be replaced, First United admitted it was new.

Given the evidence on the blowout preventers, the mud mixing equipment, the pipe, and the lack of a clear definition of "complete," we cannot say that the jury's finding that the rigs were complete is manifestly unjust, shocks the conscience, or clearly demonstrates bias. *See Pool,* 715 S.W.2d at 635. Accordingly, we overrule First United's sixth and seventh cross-points.

### (E) CLAIMS FOR SERVICES PERFORMED AND MONEY ADVANCED TO XPLOR AND SWEETWATER (PART.)

In cross-points eight and nine, First United argues that there is no evidence to support the jury's findings that XPLOR Petroleum Corporation or Sweetwater (part.) performed services or advanced money to First United for which it still owed. First United contends that there is some evidence that it had outstanding obligations to XPLOR Sales & Leasing but there is no evidence that it has obligations to XPLOR Petroleum Corporation, the party presently before the Court. Likewise, First United maintains that it owes money to Poe Properties or perhaps to Joe Poe personally, but there is no evidence that it owes Sweetwater (part.) any amount.

First United directs our attention to defendant's exhibit forty-four for the proposition that the evidence shows that if First United owes money for advances, it is to XPLOR Sales & Leasing and not XPLOR Petroleum Corporation. Our examination of defendant's exhibit forty-four reveals checks by Poe Properties, Incorporated, made payable to First United. Nothing in defendant's exhibit forty-four refers to an XPLOR Sales & Leasing.

The Poe group directs our attention to defendant's exhibit thirty-eight, which shows two loans made by XPLOR Petroleum Corporation to First United, one for $30,000 on July 12, 1984, and one for $135,000 on July 13, 1984. In its supplemental brief, First United argues that the debt was repaid and cites us to the statement of facts where Joe Poe, while discussing defendant's exhibit thirty-eight, states that there is a check dated July 13, 1984, for $165,000 from First United to XPLOR Petroleum Corporation. However, our examination of defendant's exhibit thirty-eight shows (1) the First United check for $165,000 to XPLOR Petroleum Corporation to which Joe Poe referred, and, (2) directly below the check the voucher to First United's $165,000 check with a handwritten notation "check voided not repaid." Defendant's exhibit thirty-eight also reveals that First United wrote a $65,000 check to XPLOR Petroleum Corporation on August 8, 1984, with the accompanying voucher showing it was for "Payment on Loan." On August 6, 1984, First United wrote a $487.51 check to XPLOR Petroleum Corporation with an accompanying voucher which states, "Interest on Loan from Explor [sic]." Without untangling all the intricacies of the XPLOR loans to First United and their repayments, we hold simply that there is some evidence that First United owed XPLOR Petroleum Corporation, the party before us, some obligations for money advanced. First United's eighth cross-point is overruled.

In cross-point nine, First United argues that there is no evidence that First United owes any money to Sweetwater (part.). First United directs our attention to plaintiff's exhibit 213, which documents dealings between Poe Properties and First United, and contends that this exhibit illustrates, if anything, unpaid lease payments on the Emsco and Challenger leases.

In response, the Poe group refers us to the testimony of Joe Poe: "I would say ... I put close to $200,000 back in [First United]. I did everything I could to help [First United]. Some of the money that was put in there by Poe Properties and *Sweetwater [(part.)]* was just transferring money in there." (emphasis added). Later in his testimony, Joe Poe said: "I think, as I testified, after that date, myself and *Sweetwater [(part.)]* probably put maybe $200,000 back in after that." (emphasis added). The Poe group then stresses that First United is not arguing that there is insufficient evidence but that there is no evidence supporting the jury's finding that First United owed Sweetwater (part.) money for advances.

When reviewing no evidence points, appellate courts must consider only the evidence and inferences tending to support the finding and disregard all evidence and inferences to the contrary. *Shults v. State*, 696 S.W.2d 126 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). Accordingly, we agree with the Poe group and hold there is some evidence supporting the jury's finding that First United owed Sweetwater (part.) money for services performed and money advanced. We do not decide whether the evidence would have been factually sufficient.

## III. CONCLUSION

We reverse that portion of the judgment denying First United any recovery on the Emsco lease, and we render judgment that First United recover $140,000 from Joe Poe, George Poe, and Sweetwater (part.), jointly and severally, as actual damages attributable to their DTPA violations with regard to the Emsco lease. We remand the matter of First United's attorney's fees under the DTPA to the trial court for determination. The judgment in all other respects is affirmed.