**LOYD ELECTRIC COMPANY, INC., Appellant,**

v.

**Henry Lee MILLETT and wife, Equale Lee Millett, Appellees.**

**No. 04–87–00466–CV.**

Court of Appeals of Texas, San Antonio.

Feb. 8, 1989.

Rehearing Denied March 29, 1989.

James E. Ingram, McCamish, Ingram, Brown & Loefler, James S. Cheslock, Jeffers, Brook, Kreager & Gragg, San Antonio, for appellant.

Les Mendelsohn, Mendelsohn, Heidelberg, Longoria & Beer, Karen Angelini, Charles A. Deacon, Brock & Kelfer, James M. Heidelberg, Schulman, Walheim & Beck, for appellees.

Before CADENA, C.J., and REEVES and CHAPA, JJ.

## OPINION

REEVES, Justice.

Loyd Electric Company (Loyd) appeals a judgment finding it to be liable in negligence and strict liability in tort for injuries to Henry Millett (Millett) caused by an electrical explosion. We conditionally affirm the judgment of the trial court, and deny Millett's crosspoint on the frivolity of Loyd's appeal.

Loyd brings four points of error. The first two assert that the jury answer to Question No. Seven finding Millett not contributorily negligent is against the great weight and preponderance of the evidence. The third point complains of the refusal of the trial court to submit a charge to the jury as to contributory negligence of Millett's employer; the fourth urges a remittitur.

On August 18, 1980, Millett was injured when a switchbox on which he was working exploded. The switchbox, also called a "safety disconnect," contained two large, 440 volt cartridge-type fuses. This switchbox serviced a syntron motor located in a tunnel at a rock crushing plant. The tunnel contained a conveyor belt which carried rock to the crusher. The switchbox in question was mounted on an electrical panel designed, manufactured and installed by Loyd for Dean Word Construction Company, Millett's employer.

On the day of the accident, when Millett arrived at work, he found the syntron tunnel had filled with water due to heavy rains the night before. From testimony it is clear the problem in the tunnel occurred whenever rainfall was heavy. Millett was the employee who consistently dealt with the problem. After surveying the situation, he checked in with his immediate supervisor, Tom Cook. Millett said Cook told him to get help and remove the water from the tunnel. Cook testified he told Millett to check the continuity of the magnet on the starter control box. This starter control

box is situated next to the disconnect switch box that exploded.

Millett, assisted by Albino Garcia, pulled the master switch to the syntron operations and set up a gasoline pump to remove the water. After the water was removed, Millett turned the master switch back on in order to use heat lamps to dry the motors.

Millett testified the next step, in what he termed "usual procedure" was to check the fuses in the switchbox by using a galvanometer, a device which measures the continuity and resistance of an electrical circuit. At this point, Millett and Garcia were joined by another Word employee, Mike Salas. Both men were with Millett when he checked the fuses.

They testified Millett knelt down in front of the switchbox. Garcia held the galvanometer. Millett tested the right fuse first. When Garcia said the check was good, Millett then positioned the testing wire to the left fuse. According to Millett, when he touched the wire to the left fuse, the box exploded. However, Salas testified that after checking the first fuse, Millett moved his hand up approximately three to four inches and touched the "hot" part of the box to cause the explosion. The explosion severely burned Millett's hands and part of his neck. He was first taken to a local hospital and later transferred to the burn unit at Brook Army Medical Hospital.

## FACTUAL INSUFFICIENCY OF THE EVIDENCE

■ In evaluating the evidence we will consider and weigh all the evidence and reverse only if the verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Dyson v. Olin Corporation,* 692 S.W.2d 456, 457 (Tex.1985).

■ Encompassed in the sufficiency point is Loyd's contention that because Millett sponsored Cook as a witness, Millett was bound by Cook's testimony and could not impeach him. This has not been a rule of evidence since 1983 when TEX.R.CIV. EVID. 607 was written to read as follows:

The credibility of a witness may be attacked by any party, including the party who called him.

This civil rule is identical to TEX.R. CRIM.EVID. 607. In *Stills v. State,* 728 S.W.2d 422, 427 (Tex.App.—Eastland 1987, no pet.), the court outlined the history of the rule against impeaching one's own witness and explained the rationale for the new rule. The Texas rule is patterned on FED.R.EVID. 607. The federal advisory committee commented on the new rule as follows:

The traditional rule against impeaching one's own witness is abandoned as based on false premises. A party does not hold out his witness as worthy of belief, since he rarely has a free choice in selecting them (sic). Denial of the right leaves the party at the mercy of the witness and the adversary. *Id.*

Persuaded by this, we decide that Millett could attack Cook's testimony.

■ Question No. 7 asked the jury to decide if Millett was contributorily negligent as to the accident. The jury found Millett not negligent in the following acts or omissions as charged by Loyd:

a. In using a galvanometer to test the fuses in the switch box.

b. In using a galvanometer to test the power in the switch box.

c. In failing to remove the fuses from the switch box before testing them.

d. In failing to use specially designed equipment which was provided by his employer for testing high voltage electrical equipment.

e. In turning the main disconnect switch on before testing the fuses.

f. In placing the wire being used with the galvanometer either on or close enough to the energized portion of the switch box to cause an electrical fire.

In our analysis of this point of error, we will first state the act and/or omission by which Loyd claims Millett was negligent. We will then outline and discuss the evidence presented to the jury.

*Millett's negligence in using a galvanometer to test fuses in the switchbox.*

*Millett's negligence in failing to remove the fuses from the switchbox before testing them.*

The jury heard Cook, Millett's supervisor, testify he had, several years prior to the accident, instructed Millett to (1) disconnect the power source, (2) take the fuses out of the switchbox, (3) check them with a volt meter, and (4) put the fuses back in the switchbox. The jury also heard Cook testify he had, on occasion, watched Millett check the fuses. Cook knew Millett used a galvonometer to check the fuses while the fuses were in place. Cook further testified that he, himself, had checked fuses, with a galvonometer, while the fuses were in place.

Garcia, Millett's helper for at least two years, testified he always held the galvonometer while Millett ran the check. Garcia said he had always used a galvonometer and that Millett checked the fuses while they were in the switchbox. Ramon Sandoval, another Word employee, testified that he had used a galvonometer to check fuses but he always took them out of the switchbox first.

Therefore, the jury heard evidence that it was a commonly accepted practice to use a galvonometer to check the fuses and it was a common practice to check the fuses in place in the switchbox.

*Millett's negligence in failing to use specifically designed equipment which was provided by his employer for testing high voltage electrical equipment.*

*Millett's negligence in turning the main disconnect switch on before testing the fuses.*

*Millett's negligence in placing the (testing) wire being used with the galvonometer on or close enough to the energized portion of the switchbox to cause an electrical fire.*

Cook stated he told Millett, that morning, to check the continuity of the magnet in the starter control and "that's all."

Conversely Millett testified he was told to empty the water from the tunnel. In so doing, he followed his own set pattern of several years' standing. He said that from 1972 to the date of the accident, he had checked the fuses five or six times a month, particularly when there had been a heavy rain that filled the syntron tunnel with water.

Millett said he would first check to see that two switches were pulled to an "off" position—the master switch and the switch to the motors in the tunnel. Then, as previously outlined, he would pump the water out of the tunnel, remove the motors' covers, and set the heat lamps in place. Millett testified the next step would be to turn on the master switch back on to have electricity in the tunnel to operate the heat lamps. Loyd asserts Millett was negligent in turning the main disconnect switch back on before testing the fuses. Millett, however, countered he had to have the master switch on for the lamps. While the lamps dried the motors, Millett would check the fuses.

Millett testified that when he wanted to check the fuses, he would pull the red handle on the switchbox to an "off" position. He said he knew when the handle was up the entire box was energized. When the handle was down, Millett said the top was still "hot," but the bottom portion was safe to test the fuses. Sandoval also testified he had checked fuses in a like fashion, with the top of the box energized.

Concerning Cook's testimony, Millett said he did not remember Cook telling him to check the magnet. Millett said he followed his normal routine that morning. As to the question of testing the fuses in place, Millett first said he was told to test them in place but later testified Cook said the fuses could be checked either way.

There was evidence Cook knew what Millett was doing that morning. He told Salas, "Mike, go out there and see how much we lack to get that hole dry." The jury could reasonably infer Cook knew Millett and Garcia were working in the tunnel. Further, there was undisputed evidence that restoring the tunnel to working condition was Millett's responsibility. Conversely, there was no evidence that checking the continuity of the magnet was part of Millett's job. The evidence was undisputed

that Millett had never before checked the magnet.

As to Millett's purported failure to use the voltmeter, Millett testified he had never been taught to use it. A voltmeter is a device that measures voltage or amperage in an electrical circuit. Garcia testified the galvonometer was the only piece of equipment he had ever used to help Millett check the fuses. However, Cook testified he believed he had taught Millett to use the voltmeter.

Loyd contends Millett touched the testing wire to the top part of the box. Millett testified he knew the top part of the box was dangerous, and he knew not to touch it. Loyd's argument primarily rests upon the videotaped deposition of Salas. It was established the morning of the accident was the very first time Salas had watched Millett perform this particular task. Both Salas and Garcia testified Millett knelt down in front of the switchbox. Garcia and Salas were some two to three feet behind him, with Garcia on Millett's right and Salas to his left.

Millett testified he touched the right fuse first, which was corroborated by Garcia, who was watching the needle on the galvonometer. He said he then touched the wire to the left fuse and the box exploded. Salas said Millett touched the top of the box. Garcia did not see this second action as he was watching the galvanometer. However, Garcia did say just before he moved his eyes to his machine, he saw Millett's hand at the bottom of the box.

There also exists a dispute as to how much of the box Salas could see. Salas testified he could see the box face clearly, and he could observe everything Millett was doing. Millett attempted to impeach Salas' testimony by demonstrating to the jury that: (1) Salas could not have observed very much because the door to the box opened to the left; (2) Salas was much shorter than Millett and even with Millett on his knees, Millett's left shoulder would have partially obstructed Salas' view; (3) Salas, on Millett's left, would have, due to his location, a right-eye view to the box, and he did not have vision in his right eye.

As to the technical cause of the accident, the jury heard expert testimony presented by both sides. Loyd called Paul Silber, a consulting mechanical/electrical engineer. Silber testified the only way the accident could have happened was for a circuit or an arc to have been struck on the lineside lugs or on the breakpoints, which meant the top portion of the switchbox would have been involved. He said the circumstances could not have been as those described by Millett.

Millett called two experts: Dr. Waymon Johnston, a safety engineer, and Dr. Cedric Walker, a biomedical engineer. Johnston testified the accident occurred because the sharp, metal edges of the punch-out hole of the circuit box sawed through the insulation of the cables going into the box (the lineside), and thereby the entire box became energized. When Millett brushed back the door of the energized circuit box, the door touched the adjacent metal circuit box. The contact between the two boxes created a dead short that caused the explosion.

Walker testified the explosion could have happened one of two ways, one of which was that described by Sibler. However, it was his opinion that because of the absence of a bushing around the punch-out hole and the absence of a ground wire, the contact of the metal door with the adjacent metal box set off the chain of events for the dead short.

Loyd also complains that Millett was negligent in using the galvonometer to test the power in the switchbox. The jury heard testimony that Millett was trained to use a galvonometer to test fuses. The jury had the duty to weigh the evidence as presented.

Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection and which is a legally contributing cause, cooperating with the negligence of the defendant in bringing about the plaintiff's harm. RESTATEMENT (SECOND) OF TORTS § 463 (1965). The standard of conformity is that of a reasonable man under like circumstances. *Id.* at § 464.

In this case it was undisputed that it would have been a better practice to have taken the fuses out of the box to test them. It is further undisputed that the voltmeter is the safer instrument to test fuses.

However, it was also undisputed (1) Cook taught Millett how to check the fuses; (2) Cook and Sandoval, at one time or other, had checked the fuses with a galvonometer; (3) Cook had been known to test fuses in the box; (4) Cook knew how Millett tested the fuses; (4) Millett had performed the same job, in the same way, from 1972 to 1980; (5) Garcia had never used any instrument, as Millett's helper, other than a galvonometer; (6) the switchbox contained no warnings nor instructions concerning use.

Millett's conduct conformed to the standard he had been taught and to the standard in use at the employer's place of business. Millett was not an electrician. His limited knowledge was gained through experience. He performed his task in the manner practiced by and approved by his superiors. *Accord Magro v. Ragsdale Bros.*, 721 S.W.2d 832, 833–35 (Tex.1986); *See also Texas Pipe Bending Co. v. Gibbs*, 580 S.W.2d 41 (Tex.Civ.App.—Houston [1st Dist.]), *writ ref'd n.r.e. per curiam*, 584 S.W.2d 702 (Tex.1979); *Beadel and Co. v. De La Garza*, 690 S.W.2d 71 (Tex.App.—Dallas 1985, writ ref'd n.r.e.).

■ It is for the jury to judge the credibility of the witnesses, to assign the weight to be given their testimony and to resolve any conflicts or inconsistencies in the evidence. *Lively Exploration Company v. Valero Transmission Company*, 751 S.W.2d 649, 656 (Tex.App.—San Antonio 1988, no writ). This Court is not a fact finder and thus we may not pass on the credibility of the witnesses or substitute our judgment, even if so inclined, for that of the trier of the fact. *See Clancy v. Zale Corporation*, 705 S.W.2d 820, 826 (Tex.App.—Dallas 1986, writ ref'd n.r.e.).

In this case the jury found that Millett was not contributorily negligent. A full review of all the evidence indicates this finding was not manifestly unjust, does not shock the conscience of the court and does not demonstrate any bias. *See Pool v. Ford*, 715 S.W.2d 629, 635 (Tex.1986). *See also Poe v. Hutchins*, 737 S.W.2d 574, 585 (Tex.App.—Dallas 1987, writ ref'd n.r.e.).

Appellant's first point of error is overruled.

Loyd next complains the trial court erred in overruling its motion for new trial because the jury failed to answer Special Issue No. 8. This issue reads, in relevant part, as follows:

> If in answer to Questions 3, 5, 6 and 7, you found that more than one party's acts, omissions or product caused the occurrence or injuries in question and only in that event, then answer Question 8.

Question No. 3 asked if the jury found the defect a producing cause of the occurrence in question; the jury answered yes. Question No. 5 asked the jury if the failure (to give warnings and instructions) was a producing cause of the occurrence in question; the jury answered yes. Question No. 6 asked if Loyd had committed any negligent act or omission which was a proximate cause of the occurrence in question; the jury answered yes. Question No. 7 asked if Millett had committed any negligent act or omission which was a proximate cause of the occurrence in question; the jury answered no. The jury did not find that any other party caused the occurrence or injuries in question. Therefore, the jury properly followed instructions when it did not answer Question No. 8. This point of error is overruled.

## EMPLOYER'S CONTRIBUTORY NEGLIGENCE

■ Loyd specifically argues that because Millett had settled a workers' compensation claim, Millett's employer, Dean Word Construction Co., became a settling tortfeasor subject to an allocation of fault as held in *Duncan v. Cessna Aircraft Company*, 665 S.W.2d 414 (Tex.1984). In the third point of error, Loyd argues the trial court erred in overruling its motion for new trial because the court refused to submit a special issue involving the contrib-

utory negligence of Millett's employer. The requested question reads as follows:

> On the occasion in question, did the Plaintiff's employer, Dean Word Co., commit any negligent act or omission which was a proximate cause of the occurrence in question?

In *Perma Stone v. Teakell*, 653 S.W.2d 483, 490 (Tex.App.—Corpus Christi), *rev'd*, 658 S.W.2d 563 (Tex.1983), Teakell was injured during the course and scope of his employment. He filed for and received Workers' Compensation benefits prior to filing suit against a third party involved in the incident. *Id.* The trial court refused to submit special issues inquiring as to negligence on the part of Teakell's employer. *Id.* The court of appeals held there existed no distinction between a settling tortfeasor and a Workers' Compensation subscribing employer. *Id.* at 492.

The Texas Supreme Court disagreed and held that the trial court did not err in refusing to submit the special issues. 658 S.W.2d at 563. *See also Magro v. Ragsdale Bros., Inc.*, 721 S.W.2d 832, 835 (Tex. 1986); *Varela v. American Petrofina Company of Texas*, 658 S.W.2d 561 (Tex. 1983); *Texas Industries, Inc. v. Lucas*, 634 S.W.2d 748, 756 (Tex.App.—Houston [14th Dist.] 1982), *rev'd on other grounds*, 696 S.W.2d 372 (Tex.1984). Appellant's third point of error is overruled.

## REMITTITUR

■ Factual sufficiency is the sole remittitur standard. *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex.1986). Lower courts should examine all the evidence in the record to determine whether sufficient evidence supports the damage award, remitting only if some portion is so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust. *Id.*

Loyd specifically complains of an award of $350,000.00 for Millett's loss of future earning capacity. Millett went to work for Word in 1962 as a laborer. Through the years with Word, he moved to higher skill positions. At the time of the accident, he was a rock crusher plant operator earning $5.00 per hour. Millett has a limited formal education. Millett's economic expert witness testified that, based on the wage at the time of the accident and on projected wage increments, Millett's future projected loss would be $147,395.01, if he worked to age 70. The economist was then asked to hypothesize how much Millett could have earned had he been a heavy-equipment operator in Bexar County, making between $12–$14 an hour. The economist predicted, under the hypothetical, $350,000.00.

■ We find this part of the jury award to be excessive and we suggest a remittitur. When a court of appeals suggests a remittitur, it should state clearly why the jury's finding is so factually insufficient or so against the great weight and preponderance as to be manifestly unjust. *Id.* There is no indication on the record that Millett had ever aspired to become a heavy equipment operator in Bexar County. There is no evidence that Millett had any of the prerequisite skills for such employment. Further, there is no evidence that Word contemplated any such similar move for Millett had he stayed with the Word organization.

The rule for determining the amount of proof necessary for establishing loss of earning capacity was stated by the Supreme Court in *Bonney v. San Antonio Transit Company*, 160 Tex. 11, 325 S.W.2d 117 (1959). The Court said that where a plaintiff seeks damages for impairment of earning capacity, he must prove the amount of such damages with the degree of certainty to which it is susceptible. *Id.* at 121. Here Millett was able to prove his past earning history and his economist was able to project a future sum that allowed for constant decreases in the value of the dollar and the commensurate increases in salary. However, increased sums based on an answer to a hypothetical question falls into the realm of conjecture disapproved in *Bonney*. 325 S.W.2d at 121.

As to Loyd's objection that Millett's forecast was based on a presumption that he would work until age 70, there was some evidence, for the jury, that Millett used this age in his own personal planning because

he thought 70 was a mandatory retirement age.

While this Court does not attempt to stand in place of the jury, we do find that the evidence on loss of future earning capacity is factually insufficient to support the award as it stands. *See Brown v. Robinson,* 747 S.W.2d 24 (Tex.App.—El Paso 1988, no writ).

■ If part of an award lacks sufficient evidentiary support, the proper course is to suggest a remittitur of that part of the verdict. *Larson v. Cactus Utility Co.,* 730 S.W.2d 640, 641 (Tex.1987). Millett's expert calculated a future wage analysis loss, with inflation and other economic factors, to be $207,083.07, which would include factors for raises. This Court suggests a remittitur of $142,916.93 and hereby gives Millett the option of accepting the remittitur or having the case remanded. *Id.*

■ Loyd also complains of the other damages awarded by the jury that deal with awards for pain and suffering, future medical expenses, past and future physical impairment and the award for loss of consortium. The jury heard evidence about Millett's past surgical procedures, hearing loss, sexual disfunction, weight loss and other afflictions. There was evidence that Millett has psychological problems stemming from the accident. Mrs. Millett and her son testified as to changes in Millett's personality and the effect thereof on personal and familial relationships.

In reviewing this complaint, we must keep in mind that the amount of damages awarded for personal injuries, such as pain and suffering, disfigurement, physical impairment and loss of consortium are primarily and peculiarly within the province of the jury. *See Firestone Tire and Rubber Co. v. Battle,* 745 S.W.2d 909 (Tex.App.—Houston [1st Dist.] 1988, writ denied). *See also Monsanto Co. v. Johnson,* 675 S.W.2d 305 (Tex.App.—Houston [1st Dist.] 1984), writ ref'd n.r.e., 696 S.W.2d 558 (Tex. 1985). We hold there was sufficient evidence for the jury awards.

Loyd also complains that the amount of pre-judgment interest is excessive. The pre-judgment interest set by the court was to be calculated on the damages accruing before trial. As these awards have been left intact by this court, Loyd's complaint is without merit. *See* TEX.REV.CIV.STAT. ANN. art. 5069–1.05; *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex.1985).

### MILLETT'S ASSERTION OF A FRIVOLOUS APPEAL

■ Millett claims that Loyd has taken this appeal for delay and without sufficient cause. Millett requests that delay damages be assessed against Loyd pursuant to TEX.R.APP.P. 84.

The rule for delay damages should be applied with prudence, caution and after careful deliberation. *Pruter v. Hopson,* 710 S.W.2d 92, 95 (Tex.App.—Beaumont 1986, no writ). We must look at the case from the point of view of the advocate and determine whether he has reasonable ground to believe that the case would be reversed. *Beckham v. City Wide Air Conditioning Co.,* 695 S.W.2d 660, 663 (Tex. App.—Dallas 1985, writ ref'd n.r.e.).

■ As Loyd has pointed out, the right to an appeal is a sacred and valuable right. *See Trinity Universal Insurance Company v. Farley,* 408 S.W.2d 776, 780 (Tex.Civ. App.—Tyler 1966, no writ). While many issues raised by Loyd can be considered well settled for purposes of judicial direction, the suggested remittitur is an indication that Loyd had some basis for his appeal. Millett's counterpoint is overruled.

The judgment is conditionally affirmed. Millett is given fifteen (15) days from the date of this opinion to file a remittitur of $142,916.93. If Millett should file the remittitur within the given period, the judgment will be affirmed. Otherwise the judgment will be reversed and the cause remanded for new trial. TEX.R.APP.P. 85. *See Larson v. Cactus Utility Co.,* 730 S.W. 2d at 641.

### ON APPELLEE'S MOTION FOR RE- HEARING AND ACCEPTANCE OF REMITTITUR

On February 8, 1989, this Court stated by opinion that if appellees, Henry Lee

Millett and wife, Equale Lee Millett, would file a remittitur of $142,916.93 within 15 days, the judgment of the trial court would be affirmed as modified; otherwise the judgment would be reversed and the cause remanded for new trial. On February 23, 1989, appellees filed a remittitur of $142,-916.93.

Accordingly, the judgment is modified to reflect a remittitur of $142,916.93. Appellee's motion for rehearing is denied. The judgment is affirmed as modified. TEX.R. APP.P. 85.