ABBOTT LABORATORIES, INC. (ROSS LABORATORIES DIVISION); Bristol–Myers Squibb Company; Mead Johnson & Company; and American Home Products Corporation (Wyeth–Ayerst Laboratories Division), Petitioners,

v.

Crystal SEGURA; Teri Norton; Sherri Chretien; Janice Kimler; Tessia Innocenti; Angela Christine Maroney; Melissa Whittaker Duran; and Tracey Freezia Leudeman, Respondents.

No. 94–0514.

Supreme Court of Texas.

Argued Jan. 19, 1995.

Decided June 29, 1995.

Rehearing Overruled Oct. 27, 1995.

Michael N. Sohn, Washington, DC, Philip K. Maxwell, Austin, Thomas H. Brill, Mission Hills, KS, Carl A. Parker, Rife S. Kimler, Port Arthur, R. Lawrence Ward, William E. Quirk, Ellen Martin, Kenton C. Granger, Raymond L. Dahlberg, Kansas City, MO, Vernon N. Reaser, Jr., Victoria, William Douglas Hammond, Carron L. Haight, Houston, Marc M. Seltzer, Los Angeles, CA, Tim Labadie, Austin, Angela K. Green, Kansas City, MO, for respondents.

Brian S. Greig, Austin, Layne E. Kruse, Houston, Shannon H. Ratliff, D.L. (Lin) Hughes, Austin, J. Andrew Langan, Chicago, IL, John R. Hulme, Louis P. Bickel, Dallas, Douglas D. Broadwater, Max R. Shulman, Beth L. Trent, New York City, Patton G. Lochridge, Austin, Mark J. Spooner, Mark R. Merley, Washington, DC, for petitioners.

PHILLIPS, Chief Justice, delivered the opinion of the Court, in which HIGHTOWER, HECHT, ENOCH and OWEN, Justices, join.

In this case, we decide whether the long-standing bar to indirect purchaser recovery in antitrust suits also bars indirect purchasers who primarily allege antitrust conduct, but who sue under the Texas Deceptive Trade Practices–Consumer Protection Act ("DTPA"). Tex.Bus. & Com.Code Ann. §§ 17.41–17.63 (Vernon 1987). The court of

appeals held that retail buyers of infant formula "stat[ed] causes of action for unconscionable price disparity and taking advantage of plaintiffs' lack of capacity, knowledge, and experience to a grossly unfair degree." 873 S.W.2d 399, 408. We hold that indirect purchasers cannot recover under the DTPA upon allegations on which recovery would have been barred if brought under the Texas Free Enterprise and Antitrust Act ("the Antitrust Act"). TEX.BUS. & COM.CODE ANN. §§ 15.20, 15.21 (Vernon 1987). Accordingly, we reverse the judgment of the court of appeals and render judgment that the plaintiff-intervenors take nothing as a matter of law.[1]

This case began in September 1991 when the Attorney General of the State of Texas sued Bristol–Myers Squibb Company, its wholly-owned subsidiary Mead Johnson & Company, Abbott Laboratories, Inc., a division of Ross Laboratories Division, and the American Academy of Pediatrics ("AAP"), seeking injunctive relief and damages under sections 15.20 and 15.21 of the Antitrust Act. The State alleged that the manufacturers conspired with each other to fix the wholesale price of infant formula and with the AAP to monopolize markets for infant formula and infant formula advertising. Specifically, the State maintained that the manufacturers' marketing plan created the appearance that pediatricians endorsed particular brands of infant formula, thus creating an illusion of uniqueness which was wholly unwarranted because federal regulations govern quality control and nutritional standards resulting in nearly identical products.

The State sought damages as *parens patriae* on behalf of consumers who purchased the infant formula and on behalf of the Women, Infants, and Children Program, a federally funded food distribution program administered by the Texas Department of Health. 42 U.S.C.A. § 1786 (1994); TEX.AGRIC.CODE ANN. § 15.001–7 (Vernon Supp.1995). The manufacturers and the AAP specially excepted to the Attorney General's pleadings on the grounds that since neither the consumers nor *the WIC* program were direct purchasers,

they lacked standing under the Antitrust Act. *See Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (forbidding indirect purchasers to recover under federal antitrust laws). Moreover, since the State sues as *parens patriae* on behalf of its consumers to recover damages caused by an antitrust violation, it has no greater right to recovery than the consumers it represents. *Kansas & Mo. v. Utilicorp United,* 497 U.S. 199, 219, 110 S.Ct. 2807, 2818, 111 L.Ed.2d 169 (1990). Therefore, the manufacturers argued, the State's derivative claim on the indirect purchasers behalf was also barred for the same reason. The trial court sustained the special exceptions and dismissed the damages claim, but left the State's injunction claim pending.

Crystal Segura and other infant formula consumers intervened in the State's ongoing enforcement action, adding American Home Products Corporation as an additional manufacturer-defendant but omitting the AAP. The intervenors brought claims for damages against the manufacturers for the same conduct alleged by the State under the Antitrust Act. The intervenors, however, alleged that the conduct violates the Texas DTPA's prohibition against unconscionable conduct. TEX. BUS. & COM.CODE ANN. § 17.50(a)(3) (Vernon 1987). The manufacturers filed a plea to the jurisdiction and specially excepted to the intervenors' pleadings on the grounds that the intervenors' "classic antitrust claims" of price-fixing and monopolization are not cognizable under the DTPA.

The trial court sustained the manufacturers' special exceptions and allowed the intervenors thirty days to replead. The intervenors made only slight changes, retaining their core allegations that the manufacturers violated the DTPA by attempting to monopolize the infant formula market and creating barriers to entry by these methods: 1) creating the illusion that infant formula products are somehow unique and nutritionally different, when all brands are nutritionally identical; 2) creating and maintaining dedicated franchise relationships with physicians and hospitals that endorse the purchasing of a

---

1. The plaintiff-intervenor class will be referred to collectively as "intervenors," and the defendant infant formula manufacturers will be referred to as "manufacturers."

particular brand name while Texas consumers are kept ignorant of the monies and lavish promotional resources which these physicians and hospitals receive for these endorsements; 3) giving free samples through franchise physicians and hospitals during the first months of infants' lives, thereby creating an endorsement of the manufacturers' products and later grossly overcharging Texas consumers in the retail market for baby formula products; 4) using market dominance to prevent other companies from selling baby formula products to consumers through direct consumer advertising that could inform Texas consumers about the generic nature of these products and permit informed buying decisions based upon price and nutritional information; and 5) implementing nearly identical price increases. These allegations are also nearly identical to the allegations made by the antitrust plaintiffs, all of whom are direct purchasers and retailers of formula, in a multi-district consolidation currently pending in the Northern District of Florida. *See In re Infant Formula Antitrust Litigation,* MDL Docket No. 878, 1992 WL 503465 (N.D.Fla).

The manufacturers moved for summary judgment, arguing that (1) the intervenors' claims are cognizable only under the Antitrust Act, under which the intervenors, as indirect purchasers, lack standing, and (2) alternatively, even if the intervenors' claims are DTPA claims, the intervenors have no standing because the DTPA and the Antitrust Act must be harmonized and the Antitrust Act bars suits by indirect purchasers.

By response, the intervenors conceded that their claim would be barred under the Antitrust Act, but maintained that their pleadings were sufficient to state a cause of action under the DTPA for "unconscionable action or course of action." TEX.BUS. & COM.CODE ANN. § 17.45(5).

The trial court granted summary judgment for the manufacturers against the intervenors, severing that part of the case from the State's enforcement action. The court of appeals reversed and remanded for trial on the merits. We granted the manufacturers' writ of error.

The manufacturers moved for summary judgment on two closely related grounds, neither of which specifically addressed unconscionability, but both of which assert that the bar to indirect purchaser recovery in antitrust controls the outcome of this action.[2] In reviewing the judgment of the court of appeals, we therefore do not consider whether the manufacturers established by their summary judgment proof that the alleged conduct was not unconscionable as a matter of law under the DTPA.

■ We begin with the Legislature's mandate that Texas antitrust law be harmonized with federal antitrust law. TEX.BUS. & COM.CODE ANN. § 15.04;[3] *see Caller–Times Pub. Co. v. Triad Communications Inc.,* 826 S.W.2d 576, 580 (Tex.1992). Allowing the intervenors to sue under the DTPA on allegations that are virtually identical to the antitrust allegations made by both the Texas

**2.** The specific grounds found in the defendants' motion for summary judgment are as follows:

> A. The claims asserted by plaintiff-intervenors, although couched in the language of the Texas Deceptive Trade Practices Act ("DTPA"), are cognizable only under the Texas Free Enterprise and Antitrust Act (the "TFEAA"); plaintiff-intervenors, as indirect purchasers of infant formula, have no standing under the TFEAA to bring such claims.
> B. In the alternative, even if plaintiff-intervenors' claims are cognizable as DTPA claims, plaintiff-intervenors still have no standing because the later-enacted TFEAA, which specifically addresses the claims asserted by plaintiff-intervenors, bars suits by indirect purchasers. The concurrence focuses on only the first half of the first ground and determines that the intervenors' claims have no merit as DTPA claims. This

is an issue we need not decide because even if the motion for summary judgment could be read as raising an issue on unconscionability, we choose to dispose of this case on the primary grounds argued by the parties in both the trial court and on appeal.

**3.** Section 15.04 provides:

> The purpose of this Act is to maintain and promote *economic competition in trade and* commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers in the state. The provisions of this Act shall be construed to accomplish this purpose and *shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes* to the extent consistent with this purpose. (emphasis added).

Attorney General and the multi-district litigation plaintiffs in Florida would essentially permit an end run around the policies allowing only direct purchasers to recover under the Antitrust Act.

The legal reasoning behind the prohibition on indirect purchaser recovery in antitrust has three principal bases, each of which the Supreme Court discussed at some length in *Illinois Brick*. First, the prohibition on indirect purchaser recovery had its genesis in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). That case involved an antitrust treble-damages action brought under section 4 of the Clayton Act against a manufacturer of shoe machinery by one of its customers, a manufacturer and wholesaler of shoes (a *direct* purchaser). In defense of allegations of monopolistic pricing, the shoe machinery manufacturer sought to show that the plaintiff-wholesaler had not been injured in its business as required by section 4 because it had passed on the claimed illegal overcharge to those who bought shoes from it, namely retailers and ultimately consumers. In *Hanover Shoe,* the Court rejected as a matter of law the defense that indirect, rather than direct purchasers, were the parties injured by the antitrust violation. *See Hanover Shoe,* 392 U.S. at 487–94, 88 S.Ct. at 2228–32; *see also Illinois Brick,* 431 U.S. at 728–36, 97 S.Ct. at 2065–70.

Then, in 1977, in *Illinois Brick,* the Court held that if an antitrust violator may not use a pass-on theory defensively to avoid liability against a direct purchaser as it had held in *Hanover Shoe,* an indirect purchaser also may not use a pass-on theory offensively to win damages against an antitrust violator. The Court stated: "We are left, then, with two alternatives: either we must overrule *Hanover Shoe* (or at least narrowly confine it

to its facts), or we must preclude [indirect purchasers] from seeking to recover on their pass-on theory. We choose the latter course." *Id.* at 736, 97 S.Ct. at 2070.

The second reason for allowing only direct purchasers to recover in antitrust is that "the uncertainties and difficulties in analyzing price and output decisions in the real economic world rather than in an economist's hypothetical model" is too complex for efficient judicial resolution. *Illinois Brick,* 431 U.S. at 732, 97 S.Ct. at 2067–68. Antitrust suits would become even more complex and burdensome as the courts attempted to determine the proper apportionment of pass-on antitrust charges to each level of indirect purchasers.[4] We are persuaded by the reasoning of *Illinois Brick:*

> Permitting the use of pass-on theories under § 4 [of the Clayton Act] essentially would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed part of the overcharge from direct purchasers to middlemen to ultimate consumers. However appealing this attempt to allocate the overcharge might seem in theory, it would add whole new dimensions of complexity to treble-damages suits and seriously undermine their effectiveness.

*Id.* at 737, 97 S.Ct. at 2070. In both *Hanover Shoe* and *Illinois Brick,* the Court expressed "concern for the reduction in the effectiveness of [antitrust] suits if brought by indirect purchasers with a smaller stake in the outcome than that of direct purchasers suing for the full amount of the overcharge." *Illinois Brick,* 431 U.S. at 745, 97 S.Ct. at 2074. The third reason for precluding indirect purchasers from recovering on a pass-on theory is that it opens the door to multiple recoveries. *See Illinois Brick,* 431 U.S. at

---

**4.** It is possible, with sufficient simplifying assumptions, to determine a formula for calculating how the overcharge is to be distributed between the direct purchaser and the indirect purchasers. The formula would assume that the market for the direct purchaser's product is perfectly competitive, the overcharge is imposed *equally* on all indirect purchasers, and that the direct purchaser maximizes its profits. If this is the case, the ratio of the shares of the overcharge borne by the direct purchaser and the indirect

purchaser will equal the ratio of the elasticities of supply and demand in the market for the direct purchaser's product. *Illinois Brick,* 431 U.S. at 741, 97 S.Ct. at 2072; *see also* Schaefer, *Passing–On Theory in Antitrust Treble Damage Actions: An Economic and Legal Analysis,* 16 Wm. & Mary L.Rev. 883 (1975). This analysis further relies on the assumption that the proper elasticities can be determined by an already overburdened judicial system.

730, 97 S.Ct. at 2066–67. Allowing both direct purchasers and consumers to recover overcharge damages would expose antitrust defendants to duplicate damages for the same injury. 2 AREEDA & HOVENKAMP, ANTITRUST LAW, ¶ 371c, at 257–58 (rev. ed. 1995). The Supreme Court has reiterated the importance of policies preventing duplicative recoveries, avoiding claims of speculative damages, and keeping antitrust trials within judicially manageable limits. *See Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 545, 103 S.Ct. 897, 912, 74 L.Ed.2d 723 (1983).

This same reasoning applies to plaintiffs suing under the DTPA on allegations that are in essence antitrust claims. Assuming, *arguendo,* that price fixing or other anticompetitive conduct is recoverable under the DTPA, indirect purchasers would face the same proof problems as they would have faced had an antitrust cause of action been recognized. We will not interpret the DTPA in a manner that rewards creative pleading at the expense of consistent application of legal principles.

Our holding is not based on any determination of standing under the DTPA. As Areeda and Hovenkamp have noted, the Court in *Illinois Brick* saw "which persons have been injured by an illegal overcharge" as "analytically distinct" from "which persons have sustained injuries too remote to give them standing ..." *Illinois Brick,* 431 U.S. at 728 n. 7, 97 S.Ct. at 2065 n. 7; AREEDA & HOVENKAMP, *supra,* ¶ 371c, at 259. Our holding today only forecloses the recovery of damages for seeking a prohibited antitrust recovery under the masquerade of our consumer protection statute.

For these reasons, we hold that the conduct alleged by the intervenors is not actionable under the DTPA. We therefore reverse the judgment of the court of appeals and render judgment that plaintiffs take nothing as a matter of law.

CORNYN, Justice, concurring.

The Court today establishes a broad rule that bars DTPA claims by indirect purchasers when their claims are based upon unconscionable acts that could also constitute anticompetitive acts prohibited under the Texas Free Enterprise and Antitrust Act (the Antitrust Act). Although I agree that the plaintiffs in this case cannot prevail on their DTPA claims, I think it is unnecessary to reach the question of whether the Antitrust Act has such preemptive force [1] because the plaintiffs' DTPA claims are without merit. Accordingly, I concur in the Court's judgment, but I cannot join in its opinion.

## I. Preservation of Error

Rule 166a mandates that a motion for summary judgment "shall state the specific grounds therefor" and that "[i]ssues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal." TEX.R.CIV.P. 166a(c). In applying this rule, the Court adopts the view that the defendants' motion for summary judgment raised only issues dependent upon the construction of the Antitrust Act, and that the motion did not challenge the existence of a plausible DTPA claim if the Antitrust Act was found not to override the DTPA in this case. 907 S.W.2d at 505 ("[W]e therefore do not consider whether the manufacturers established by their summary judgment proof that the alleged conduct was not unconscionable as a matter of law under the DTPA."). My reading of the motion for summary judgment leads me to the conclusion that the defendants preserved error on their challenge to the merits of the DTPA claim, without regard to the potential impact of a proper construction of the Antitrust Act.

The defendants' motion for summary judgment included the following statement:

---

1. The Court does not frame its analysis as one of preemption in the traditional sense, but instead concludes that in order to harmonize the provisions of the DTPA and the Antitrust Act, we must consistently apply the limitation on suits by indirect purchasers. While the indirect purchaser rule may be consistent with the policies and goals of antitrust law, I am not convinced that the policies and goals of the DTPA are sufficiently similar to warrant the incorporation of this rule in DTPA law.

The claims asserted by plaintiff-intervenors, *although couched in the language of the Texas Deceptive Trade Practices Act ("DTPA"), are cognizable only under the [Antitrust Act];* plaintiff-intervenors, as indirect purchasers of infant formula, have no standing under the [Antitrust Act] to bring such claims.

Tr. at 711 (emphasis added). In my view, when one argues that a claim is *not cognizable* under a particular statute, this is sufficient to challenge whether a claim has been stated under that statute. *See McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 340 (Tex.1993) ("Grounds may be stated concisely, without detail and argument." (quoting *Roberts v. Southwest Tex. Methodist Hosp.*, 811 S.W.2d 141, 146 (Tex.App.—San Antonio 1991, writ denied))).

In this case, the plaintiff-intervenors brought only a DTPA claim, so the defendants' motion for summary judgment must dispose of that DTPA claim. Therefore, the only reasonable interpretation of the motion is that it challenges the validity of the DTPA claim. Thus, the first ground listed in the motion, as quoted above, must be read as arguing that: (1) the facts as alleged do not state a DTPA claim; (2) the facts as alleged do state an antitrust claim; and (3) the court cannot treat the pleadings as an antitrust claim because the plaintiff-intervenors do not have standing under antitrust law.

This interpretation is further borne out by the joint brief filed by the defendants in support of its plea to the jurisdiction and certain special exceptions, which was incorporated by reference in the motion for summary judgment: "Plaintiff-intervenors ... have failed to state a claim under the [DTPA].... The DTPA is not designed to address and does not address such antitrust violations." Tr. at 793. The brief also explains: "No provision in the DTPA, fairly construed, covers the antitrust violations alleged here." Tr. at 798–99. The brief then analyzes both prongs of the DTPA's definition of unconscionability and concludes that neither prong could be interpreted as encompassing the alleged misconduct.

These same arguments were reiterated in the briefs before the court of appeals. In the defendants' initial brief before that court, they argued, "Section 17.45 of the DTPA has never been construed to cover anti-competitive actions of the sort alleged by intervenors. Nor is there anything in the legislative history that would indicate that this section was intended to apply to price-fixing or other similar violations of the antitrust laws." Brief of Appellees, at 10. Similarly, in their motion for rehearing in the court of appeals, the defendants argued, "[T]here is no case, no bit of DTPA legislative history, and no hint by any commentator that the DTPA ever was intended or assumed to encompass price fixing or monopolization." Appellee's Motion for Rehearing, at 7–8.

Given these clear and unambiguous arguments on the merits of the DTPA claims in this case, I cannot join with the Court's discussion of the relationship between the Antitrust Act and the DTPA, when that issue is unnecessary to resolve the case before us.

## II. The Merits of the DTPA Claim

Under the DTPA, an unconscionable action or course of action is one which:

(A) takes advantage of the lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree; or

(B) results in a gross disparity between the value received and consideration paid, in a transaction involving transfer of consideration.

Tex.Bus. & Com.Code § 17.45(5).

"To obtain summary judgment, a movant must either negate at least one element of the plaintiff's theory of recovery or plead and conclusively establish each element of an affirmative defense." *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex.1995) (citations omitted). In determining whether the plaintiff-intervenors have stated a viable claim under either definition, we must take the allegations of fact alleged in their petition as true. *Nixon v. Mr. Property Mgmt. Co.*, 690 S.W.2d 546, 549 (Tex.1985). However, mere conclusory statements do not constitute effective summary judgment proof and need not be given the same presumptive force in this analysis. *See Life Ins. Co. v. Gar–Dal, Inc.*, 570 S.W.2d 378, 382 (Tex.1978).

Under the first prong of unconscionability, the plaintiff-intervenors essentially argue that only the defendants and the physicians who they recruited as surrogate salespeople had the knowledge, ability, and experience to fairly evaluate the nutritional value of infant formula. This is true, they claim, even though the defendants' products are sold through "grocery stores, supermarkets, drug stores, discount merchandisers and other retail outlets." They allege that by banding together to refrain from direct-to-consumer advertising and using the doctors to create an illusion of uniqueness or nutritional superiority, the defendants took advantage of consumers' lack of knowledge to a grossly unfair degree.

This argument fails on two counts. First, the plaintiff-intervenors assume in making these largely conclusory allegations that consumers lack the knowledge, ability, or experience to fairly evaluate the desirability of infant formula marketed by the defendants. But, certainly, consumers cannot be presumed to lack a sufficient level of knowledge to assess many factors relevant to choosing a nutritional program for their infants: the emotional and developmental advantages of breast feeding, the occasional inconveniences of breast feeding, the cost of alternatives such as breast feeding or cow's milk, and the convenience and extended shelf life of powdered infant formula. Furthermore, judicial notice may be taken of the availability of advice on every facet of child-rearing (including this one) from a burgeoning market of magazines, books, consultants, relatives, friends, public service brochures, and health care agencies. Given this general level of readily available information, the plaintiff-intervenors basic assumption that the public lacks basic information with which to evaluate the defendants' marketing techniques is simply a bald, unsupported conclusion. Whatever advantage their cumulative knowledge gave them in this market, the defendant's conduct simply cannot reasonably be construed as meeting the requisite standard of "a showing that the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated." *Chastain v. Koonce,* 700 S.W.2d 579, 584 (Tex.1985).

Second, the plaintiff-intervenors assume that the defendants' advantage is somehow different from that held by any manufacturer. Such comparison between manufacturers is relevant because, as we stated in *Chastain,* the standard against which a seller's conduct is judged is an objective one. *Chastain,* 700 S.W.2d at 583. In applying this standard, the court must determine whether the seller's attempts to tout the superiority of its products rose above mere "puffing." *See Dowling v. NADW Marketing, Inc.,* 631 S.W.2d 726, 728–29 (Tex.1982); *see also Shaw Equip. Co. v. Hoople Jordan Constr. Co.,* 428 S.W.2d 835, 838–39 (Tex.Civ.App.— Dallas 1968, no writ). Without such an objective standard, the trial court is left in the untenable position of assessing the relative value of competing products. As one amicus in this case argued:

> A courtroom ... is the wrong place to determine whether Pepsi tastes better than Coke, Old Spice smells better than Brut, Colgate whitens teeth better than Crest, Gillette shaves closer than Schick, Bayer works faster than Anacin, MCI is better than AT & T, Nike is better for slam dunking than Converse, Hewlett Packard calculators do more things than Texas Instrument calculators, and so on. Many of these "superiority" claims involve matters of opinion, taste, and preference rather than matters subject to factual verification. Robust competition—not lawsuits under the DTPA—must resolve these questions.

Amici Curiae Brief of Texas Ass'n of Bus. & Nat'l Fed. of Indep. Bus., at 11.

Instead, an unconscionability claim must establish that the seller, armed with superior knowledge, ability, or experience to discern the impropriety of a particular transaction, nonetheless employed high-pressure tactics, preyed upon a consumer's vulnerability, or used misleading inducements to convince the consumer to purchase inappropriate goods. *See, e.g., Bennett v. Bailey,* 597 S.W.2d 532, 535 (Tex.Civ.App.—Eastland 1980, writ ref'd n.r.e.) (holding a dance studio liable for an unconscionable act in its inducement of a vulnerable widow to pay $30,000 for dance lessons). Importantly, these unconscionable

acts must be directed at the consumers who lack the knowledge and ability to make an informed decision.

Because the plaintiff-intervenors allegations, taken as true, do not establish either a significant absence of knowledge and ability on behalf of consumers in our free-market, information-saturated society or an objectively determinable abusive course of action in the defendants' dealings with consumers, the claims under the first prong of unconscionability must fail.

To establish a viable claim under the second prong of unconscionability, the plaintiff-intervenors must establish that there was a gross disparity between the value received and the consideration paid. This gross disparity test has typically been applied when the product received is something other than what the buyer sought or when the product is virtually worthless, at least in comparison to the good sought. *See, e.g., Teague v. Bandy,* 793 S.W.2d 50, 56 (Tex.App.—Austin 1990, writ denied) (finding a gross disparity in value when a cow purchased as an embryo donor proved to be infertile). The disparity in value must be "complete and unmitigated." *Chastain,* 700 S.W.2d at 583.

In this case, the plaintiff-intervenors allege that there was a gross disparity in value because the manufacturing costs of the defendants' infant formula were far below the wholesale price. Between 1978 and 1990, the total manufacturing cost of a 13–ounce can of formula ranged from 20 to 32 cents. During the same period, the wholesale price ranged from 54 cents to $1.73. The plaintiff-intervenors argue that this differential between sales price and wholesale cost constitutes a gross disparity in value.

I disagree with this argument for two reasons. First, the plaintiff-intervenors have compared the wholesale price to manufacturing costs rather than the value received. While manufacturing costs certainly affect the value of a specific good, the two measures are distinct. Manufacturing costs include only the costs of raw materials and processing costs. This measure does not include the manufacturers' research costs, sales expenses, administrative costs, or profit. When these other factors are added to manufacturing costs, the resulting total, when allocated to the individual units produced, is one measure of the market value. But value is also dependent upon other considerations, such as the supply and demand in the market.

Every other reported gross disparity case under the DTPA compares the sales price to the market value. *See, e.g., Sun Power, Inc. v. Adams,* 751 S.W.2d 689, 694–95 (Tex. App.—Ft. Worth 1988, no writ); *Poe v. Hutchins,* 737 S.W.2d 574, 585 (Tex.App.— Dallas 1987, writ ref'd n.r.e.); *Bel–Go Assocs. v. Vitale,* 723 S.W.2d 182, 189 (Tex.App. Houston [1st Dist.] 1986, no writ); *Vick v. George,* 671 S.W.2d 541, 550 (Tex.App.—San Antonio 1983), *rev'd in part on other grounds,* 686 S.W.2d 99 (Tex.1984). The plaintiff-intervenors cite no cases, and we can find none, where a disparity in value is determined by reference to manufacturing costs alone.

Second, a sales price ranging from two-and-a-half to five-and-a-half times the manufacturing cost is not a gross disparity in value. Were this degree of price differential sufficient to state a claim under the DTPA, every consumer who pays $1.00 for a cup of coffee or $1.50 for french fries would have a claim of unconscionability. To hold otherwise would require courts to determine what constitutes a "fair" price. As our case law reveals, courts have refrained from making such determinations and have refused to find a gross disparity in value unless the goods received are virtually worthless. *See, e.g., Dwight's Discount Vacuum Cleaner City, Inc. v. Scott Fetzer Co.,* 860 F.2d 646, 650–51 (5th Cir.1988), *cert. denied,* 490 U.S. 1108, 109 S.Ct. 3161, 104 L.Ed.2d 1024 (1989) ("[T]he 'gross disparity' test obviously mirrors a fraud-type measure of recovery, in which a consumer receives a product inferior in quality to that which he intended to buy or, alternatively, when the consumer is defrauded out of his money entirely."); *Wyatt v. Petrila,* 752 S.W.2d 683, 685 (Tex.App.— Corpus Christi 1988, writ denied) ("In DTPA actions based on unconscionability, we look to gross disparity, not merely arguable unfairness.").

Because the plaintiff-intervenors have not claimed that there was a gross disparity between the value received and the consideration paid, and because the disparity between the manufacturing costs and the consideration paid was not a gross disparity, the summary judgment on the claims based on the second prong of unconscionability was proper.

## IV. Conclusion

I agree with the Court that the summary judgment rendered by the trial court was proper. However, I base my decision on an evaluation of the merits of the DTPA claims, a point which I conclude was before the trial court and thus preserved. Because the facts alleged, even if taken as true, do not constitute unconscionable acts under either prong of the unconscionability definition in the DTPA, I would reverse the judgment of the court of appeals and render judgment in favor of the defendants.

GONZALEZ, Justice, concurring.

I concur with the Court's opinion and judgment. I write separately to articulate additional reasons why I believe the judgment is correct. The court of appeals held that the retail buyers of infant formula stated "causes of action for unconscionable price disparity and taking advantage of plaintiff's lack of capacity, knowledge, and experience to a grossly unfair degree." 873 S.W.2d 399, 408. However, the intervenors' allegations are primarily antitrust claims, which are not cognizable under the Texas Deceptive Trade Practices–Consumer Protection Act (DTPA), TEX. BUS. & COM.CODE §§ 17.41–17.63.

In 1973, due in large part to the leadership of then Attorney General John L. Hill, the Texas Legislature passed the DTPA. The Act's stated purpose is to "protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection." *Id.* § 17.44.

A decade later, the Legislature modified existing state antitrust laws when it enacted the Texas Free Enterprise and Antitrust Act of 1983. *Id.* §§ 15.01–15.40. In subsections 15.05(a)–(e) of the Antitrust Act, the Legislature largely incorporated federal anti-monopoly and anti-combination language from sections 1 and 2 of the Sherman Antitrust Trust Act and from sections 3, 6, and 7 of the Clayton Act. TEX.BUS. & COM.CODE § 15.05(a)–(e); *see* 15 U.S.C. §§ 1, 2, 14, 17, 18. In passing the new Antitrust Act, the Legislature stated that its purpose was to "maintain and promote economic competition in trade and commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers in the state." TEX.BUS. & COM.CODE § 15.04. This section further provides, "The provisions of this Act shall be construed to accomplish this purpose and *shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes* to the extent consistent with this purpose." *Id.* (emphasis added). Therefore, the Legislature's mandate that Texas antitrust law be harmonized with federal antitrust law necessarily constrains this Court. *See Caller–Times Publishing Co. v. Triad Communications, Inc.,* 826 S.W.2d 576, 580–81 (Tex.1992).

In determining whether the intervenors may maintain a DTPA cause of action for the same conduct that would not be actionable under the antitrust laws, we look to federal case law and policy for guidance. I conclude that to allow the intervenors to pursue a cause of action under the DTPA on grounds which would not support a claim under the Antitrust Act is to create a loophole. Allowing a claim under the DTPA that state and federal antitrust law would bar can only subvert legislative intent.

In *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 746–47, 97 S.Ct. 2061, 2074–75, 52 L.Ed.2d 707 (1977), the United States Supreme Court noted that *direct purchasers* alone have standing to maintain causes of action for injuries caused by violators of federal antitrust laws. Only direct purchasers may enforce antitrust laws and collect damages to the full extent of their injuries. *Id.* at 746, 97 S.Ct. at 2074–75 (reiterating the rule of *Hanover Shoe, Inc. v. United Shoe Mach. Corp.,* 392 U.S. 481, 494, 88 S.Ct. 2224, 2232, 20 L.Ed.2d 1231 (1968)). A direct pur-

chaser is one who purchases goods or services directly from a manufacturer, wholesaler, or other provider who has violated section 4 of the Clayton Act. 15 U.S.C. § 15(a). On the other hand, an *indirect purchaser* is one who purchases goods or services from a seller or provider who is down the marketing chain from the antitrust violator. *See Illinois Brick,* 431 U.S. at 746–47, 97 S.Ct. at 2074–75. The principal reason for allowing only direct purchasers to recover in antitrust is that "the uncertainties and difficulties in analyzing price and output decisions 'in the real economic world rather than in an economist's hypothetical model' " are too complex for most courts to tackle efficiently. *Id.* at 732, 97 S.Ct. at 2067–68 (quoting *Hanover Shoe,* 392 U.S. at 493, 88 S.Ct. at 2231). This policy rationale for allowing only direct purchasers to assert causes of action applies with equal force to the state antitrust laws.

As with any statute, our primary emphasis in construing the state antitrust laws is to determine the Legislature's intent. *See Pennington v. Singleton,* 606 S.W.2d 682, 686 (Tex.1980). When determining legislative intent, we "look to the language of the statute, legislative history, the nature and object to be obtained, and the consequences that would follow from alternate constructions." *Union Bankers Ins. Co. v. Shelton,* 889 S.W.2d 278, 280 (Tex.1994). The purpose and legislative history of Texas's antitrust laws support the conclusion that the intervenors' claims are remediable only within the scheme of the Antitrust Act. The intervenors, who were indirect purchasers down the marketing chain from the alleged antitrust violator, cannot use the DTPA as a "back door" to assert a claim against one they did not deal with directly.

When the Legislature passed the Antitrust Act in 1983, it intended to create a remedy for private parties, including consumers, where none had previously existed. When then Senator Lloyd Doggett introduced the bill later enacted as the Antitrust Act to the Texas Senate, he explained that no private remedy existed at the time to remedy the harms which the Antitrust Act intended to provide. He stated:

> There is under the Texas existing law *no private remedy.* As you know, under the federal Sherman Act and under the Clayton Act, there is a private remedy so that we do not rely on government ... entirely for cleaning up the market place where there is price fixing and other illegal antitrust conspiracies.... [O]ne of the most important changes is to provide for a private cause of action.

State Bar of Texas Antitrust and Business Litigation Section, *Monograph: Texas Antitrust and Related Statutes,* at III–58 (1991) (transcript of Senate Floor Debate, May 17, 1983) (emphasis added). It stands to reason that Senator Doggett would not have stated that there was "no private remedy" if in fact the DTPA was already providing a cause of action for antitrust violations at the time the Antitrust Act was being debated. Also, then Attorney General Jim Mattox was among those urging a treble damages clause in the Antitrust Act. He argued:

> I think it's very important ... that today even under these bid-rigging cases ... we're having some difficulty in recovery, because if we move under federal law there are certain damage provisions, what we call treble damages that are available to us.
>
> Those provisions are not available to us when it is a bid-rigging situation where it is not involved in interstate commerce.
>
> . . . .
>
> ... [T]hat's basically what we're overall asking you to do, is to in effect cover the entire spectrum of business activity ... the single business, monopolistic-type practices, and then give us the power to enforce the law through bringing Texas into this area of improvement in our damages provisions, and in the penalties that can be assessed.

*Monograph, supra,* at III–3 (transcript of Hearing of Senate Jurisprudence Committee, Feb. 15, 1983).

When the Antitrust Act was passed, the version of the DTPA then in effect provided authority for treble damages. It also had the same unconscionability provision as it has today. *See* Tex.Bus. & Com.Code §§ 17.45(5), 17.50(a)(3). We have long recognized a pre-

sumption that the Legislature enacted a statute "with complete knowledge of the existing law and with reference to it." *Acker v. Texas Water Comm'n,* 790 S.W.2d 299, 301 (Tex. 1990). Furthermore, the Legislature is not presumed to have done a useless act. *Webb County Appraisal Dist. v. New Laredo Hotel, Inc.,* 792 S.W.2d 952, 954 (Tex.1990); *Hunter v. Fort Worth Capital Corp.,* 620 S.W.2d 547, 551 (Tex.1981). Had the conduct proscribed under the Antitrust Act already been covered by the provisions of the DTPA, as the intervenors argue, the Antitrust Act would have been unnecessary. Its treble remedies provision would have been redundant. I conclude that the Legislature did not commit a useless act in enacting the Antitrust Act in 1983. It provides causes of action and remedies not previously available.

Furthermore, no amendment to the DTPA since 1983 indicates any subsequent legislative intent to expand the DTPA to encompass price-fixing and monopoly claims. (Of course, there would be no need to do so, since the Antitrust Act serves this purpose.) No prior case by any court has held that price fixing and monopolization claims are proscribed by the DTPA; nor has any commentator suggested that they should be.

The intervenors and the dissenting opinion point to the cumulative remedy provisions of both the DTPA and the Antitrust Act as evidence that the DTPA may encompass the conduct alleged in this case. The cumulative remedy provision of the DTPA provides:

> The provisions of this subchapter are not exclusive. The remedies provided in this subchapter are in addition to any other procedures or remedies provided for in any other law. . . . An act or practice that is a violation of law other than this subchapter may be made the basis of an action under this subchapter *if the act or practice is proscribed by a provision of this subchapter or is declared by such other law to be actionable under this subchapter.*

TEX.BUS. & COM.CODE § 17.43 (emphasis added). According to section 17.43, therefore, either the DTPA must make conduct illegal or another statute must, and refer to the DTPA as the source for a cause of action to remedy it. In short, there are two methods by which a DTPA cause of action can be reached. The Antitrust Act's cumulative remedy provision states:

> The provisions of this Act are cumulative of each other and of any other provisions of law of this state *in effect relating to the same subject.*

*Id.* § 15.02 (emphasis added). The Antitrust Act is cumulative if another statute provides a remedy "in effect relating to the same subject." Unless at least one of these conditions is met, the DTPA and the Antitrust Act are not cumulative.

Under the foregoing provisions, may the intervenors maintain a DTPA cause of action? I think not. First, the DTPA itself does not cover, by its own terms, the conduct the intervenors alleged. The direct avenue to DTPA recovery is unavailable. Second, the Antitrust Act does not expressly declare that the conduct it proscribes is actionable under the DTPA. Thus, a plaintiff cannot reach a DTPA claim via the Antitrust Act's reference to it. There is no such cross-reference. The legislative history quoted above does not indicate an intent for the DTPA to provide the remedy for the subjects the Antitrust Act was intended to address. Moreover, the Antitrust Act contains its own remedy provisions for those entitled to make a claim for relief.

The dissent also argues that since the Antitrust Act is not expressly exempted from the DTPA, it must be cumulative with the DTPA. This argument fails because of a false premise, namely that the DTPA initially would have addressed conduct covered by the Antitrust Act. The legislative history of the Antitrust Act establishes that because the DTPA did not initially cover claims sounding in antitrust, there was no need for an exemption.

For these reasons, the conduct alleged by the intervenors is not actionable under the DTPA.

GAMMAGE, Justice, joined by SPECTOR, Justice, dissenting.

The dispositive issue here is whether the Texas Free Enterprise and Antitrust Act ("Antitrust Act") precludes plaintiffs as indi-

rect purchasers from bringing suit for misrepresentation, fraud, price-fixing, and market monopolization against infant formula manufacturers under the Texas Deceptive Trade Practices–Consumer Protection Act ("DTPA"). Because the Antitrust Act is not the exclusive remedy for these practices and does not preclude consumers from bringing suit under the DTPA, I respectfully dissent.

### I.

The majority concludes that any action barred by *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), should similarly be barred even if the claimants assert a DTPA and not an antitrust claim. It reasons that under *Illinois Brick* federal antitrust law prohibits suits by indirect purchasers, and that, because the Texas antitrust statute is identical to the federal statute, Texas antitrust law also prohibits suits by indirect purchasers. The majority contends that if the DTPA allows indirect purchasers to sue for monopolistic practices, then it irreconcilably conflicts with the Antitrust Act. It does not suggest that any particular provision of the Antitrust Act conflicts with the DTPA, arguing instead that the legislature intended the Antitrust Act to be consistent with federal statutes.

The Antitrust Act by its own terms does not conflict with the DTPA, and the majority's argument that the Antitrust Act is the exclusive remedy for allegations which may sound in both antitrust and DTPA conflicts with the cumulative remedy provisions of both the Antitrust Act and the DTPA. The Antitrust Act provides that "[t]he provisions of this Act are *cumulative* of each other and *of any other provision of law* of this state in effect *relating to the same subject*." TEX. BUS. & COM.CODE § 15.02(a) (emphasis added). The DTPA also provides: "The provisions of this subchapter *are not exclusive.* The remedies provided in this subchapter are *in addition to* any other procedures or remedies provided for in *any other law*." *Id.* § 17.43 (emphasis added).

Had the legislature intended that all anticompetitive conduct be actionable exclusively under the Antitrust Act it would have said so with specific language. Instead, the statute provides just the opposite. The intent that the Antitrust Act not be exclusive even when in conflict with another law is demonstrated by its legislative history. As originally introduced, Senate Bill 397, which enacted the state's antitrust act, provided that "[w]henever the application of any provision of this Act conflicts with the application of any other law of this State, the provisions of this Act shall prevail." The legislature deleted this language before final passage. "[T]he deletion of a provision in a pending bill discloses the legislative intent to reject the proposal." *Camacho v. Samaniego,* 831 S.W.2d 804, 814 (Tex.1992) (quoting *Smith v. Baldwin,* 611 S.W.2d 611, 616–617 (Tex.1980)). Not only did the legislature reject the provision, it went even further to adopt an alternative provision expressly making the Antitrust Act cumulative. Moreover, had the legislature intended to exclude DTPA coverage for conduct potentially violating the state antitrust act, it would have done so under the "exemptions" provision of the DTPA, which states the conduct and class of defendants exempted by the DTPA. TEX.BUS. & COM.CODE § 17.49. The majority circumvents clear legislative purpose and intent under the guise of statutory construction. This Court has denounced such practices:

> [Courts] are not free to rewrite the statutes to reach a result [they] might consider more desirable, in the name of statutory construction. A court may not write special exceptions into a statute so as to make it inapplicable under certain circumstances not mentioned in the statute.

*Public Utility Comm'n v. Cofer,* 754 S.W.2d 121, 124 (Tex.1988) (citations omitted). Courts are admonished to "take statutes as they find them ... giving full effect to all of its terms." *Republicbank Dallas, N.A. v. Interkal, Inc.,* 691 S.W.2d 605, 607 (Tex. 1985). Here, the majority misconstrues the intent of the DTPA contrary to its previous interpretations.[1] The DTPA should be "lib-

---

1. *See, e.g., Birchfield v. Texarkana Memorial Hosp.,* 747 S.W.2d 361, 368 (Tex.1987) (refusing to limit statute to recovery for affirmative decep-

tive acts, practices, or representations and refusing to find DTPA exemption for health care liability for claims arising before enactment of express

erally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty." TEX.BUS. & COM.CODE § 17.44.

The majority's analysis suffers from the misconception that only one cause of action arises from any particular conduct, and consequently it concludes that plaintiff-intervenors *cannot* have a DTPA cause of action because the conduct is also proscribed by the Antitrust Act. But numerous legal theories premised upon the same conduct may overlap, and the legislature may create a number of remedies for that conduct without conflict. For example, a sale of stock may give rise to liability under the Blue Sky Law, TEX.REV. CIV.STAT.ANN. arts. 581-1—581-41, as well as the DTPA, among other statutory causes. Moreover, an insurer's failure to pay a claim absent a reasonable basis may give rise to a claim under the insurance code, the DTPA, and common law bad faith, all based on the same conduct. At least one set of commentators notes that state deceptive practices statutes and antitrust laws are ordinarily cumulative:

> Numerous states have enacted Unfair and Deceptive Practices Acts, sometimes generically called UDPA or unfair competition acts. Typically, these acts proscribe unfair, unlawful, or deceptive trade practices, and are roughly analogous to § 5 of the Federal Trade Commission Act. 15 U.S.C. § 45. *A violation of state antitrust law can also be a violation of these acts* which can trigger substantial civil penalties *in addition* to penalties provided by state antitrust law.

Thomas Greene, et al., *State Antitrust Law and Enforcement, in* 32ND ANNUAL ANTITRUST LAW INSTITUTE 1991, at 617 (PLI Corp. Law & Practice Course Handbook Series No. B4–6965, 1991) (emphasis added). Likewise,

California recognizes its state deceptive trade practices act includes price-fixing violations. *See People v. National Ass'n of Realtors*, 120 Cal.App.3d 459, 174 Cal.Rptr. 728 (Cal.Ct.App.1981). That court held that California's unfair trade practices act provision for treble damages could apply to a state antitrust action, because if the legislature intended to exclude an antitrust violation from the act's provision such an exclusion would have been expressly included in the act itself. *Id.* at 475, 174 Cal.Rptr. 728.

### II.

Plaintiff-intervenors pleaded a cause of action exclusively under the DTPA, alleging that defendants violated sections 17.45(5)(A) and (B), which provide:

> (5) "Unconscionable action or course of action" means an act or practice which, to a person's detriment:
>
> > (A) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or
> >
> > (B) results in a gross disparity between the value received and consideration paid in a transaction involving transfer of consideration.

TEX.BUS. & COM CODE §§ 17.45(A) & (B). The plaintiff-intervenors allege the defendant-infant formula manufacturers capitalized on the vulnerability and inferior knowledge and bargaining position of consumers by using physicians, nurses, and other hospital staff to indoctrinate parents to use their particular brands of infant formula. These parents were deceived by implicit misrepresentations that the proffered infant formula contained properties different or unique from other, less expensive brands. But federal regulations mandate that all formulas contain the same essential ingredients and nutritional value, and, knowing that parents are sus-

---

exemption); *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 352 (Tex.1987) (refusing to require actual payment to establish "consumer" standing); *Mayo v. John Hancock Mutual Life Insurance Co.*, 711 S.W.2d 5, 6 (Tex.1986) (rejecting argument that insured's recovery of penalties under Article 3.62 precluded suit under Article 21.21); *Vail v. Texas Farm Bureau Mut. Ins. Co.*, 754 S.W.2d 129, 132, 135 (Tex.1985)

(holding that recovery under an insurance contract does not preclude statutory recovery, and that the legislature did not intend to exempt insurers from DTPA liability); *Big H Auto Auction, Inc. v. Saenz Motors*, 665 S.W.2d 756, 758 (Tex.1984) (refusing to exclude purchasers who bought goods for resale from the definition of "consumer").

ceptible to the recommendations of physicians and nurses, the defendants used those professionals as a virtual secondary sales force to influence and defraud consumers into purchasing their products.[2] These allegations state classic DTPA violations.

The DTPA generally requires only that a purchaser or prospective purchaser be "connected with" the transaction, and no privity of contract is necessary. *Kennedy v. Sale,* 689 S.W.2d 890, 892–93 (Tex.1985); *Flenniken v. Longview Bank & Trust Co.,* 661 S.W.2d 705, 707 (Tex.1983); *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 540–41 (Tex.1981). The class which may recover encompasses everyone who seeks to enjoy the benefits of the transaction. *Cameron,* 618 S.W.2d at 541. Indirect purchasers who are "consumers" have always been allowed to bring DTPA claims without a privity requirement. The majority now conjures the new question whether all DTPA claims will be henceforth subject to a privity requirement which overrules this Courts' consistent precedents, *see Kennedy,* 689 S.W.2d at 892–93; *Flenniken,* 661 S.W.2d at 707; *Cameron,* 618 S.W.2d at 540–41, and it does so under the chimera of an antitrust analysis to avoid confronting a huge body of established Texas DTPA law.

For the foregoing reasons, I dissent. I would affirm the judgment of the court of appeals that the plaintiff-intervenors stated a viable cause of action for unconscionability under the DTPA.

---

**2.** A Ross Laboratories Training Manual emphasized the importance of the hospital staff:
> Ross Hospital Feeding System is designed to provide an early and convenient means of getting infants started on Similac ... and ultimately sent home with instructions that they continue to use Similac.

> Never underestimate the importance of nurses. If they are sold and serviced properly, they can be strong allies. A nurse who supports Ross is like an extra salesperson.